# 13-3565-cv(L)

13-3636-CV(CON), 15-0432-cv(CON), 15-0441-cv(CON), 15-0454-cv(CON), 15-0477-cv(CON), 15-0494-cv(CON), 15-0498-cv(CON), 15-0524-cv(CON), 15-0537-cv(CON), 15-0547-cv(CON), 15-0551-cv(CON), 15-0611-cv(CON), 15-0620-cv(CON), 15-0627-cv(CON), 15-0733-cv(CON), 15-0744-cv(CON), 15-0778-cv(CON), 15-0825-cv(CON), 15-0830-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

———————————

Ellen Gelboim, on behalf of herself and all others similarly situated,

*(For Continuation of Caption See Inside Cover)*

————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT BRIEF FOR PLAINTIFFS-APPELLANTS

KAREN L. MORRIS
PATRICK F. MORRIS
MORRIS AND MORRIS LLC
  COUNSELORS AT LAW
4001 Kennett Pike, Suite 300
Wilmington, Delaware 19807
(302) 426-0400

DAVID H. WEINSTEIN
ROBERT S. KITCHENOFF
WEINSTEIN KITCHENOFF & ASHER LLC
1845 Walnut Street, Suite 1100
Philadelphia, Pennsylvania 19103
(215) 545-7200

THOMAS C. GOLDSTEIN
ERIC F. CITRON
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814
(202) 362-0636

*Counsel for Plaintiffs-Appellants Ellen Gelboim
and Linda Zacher in Case No. 13-3565*

*(For Continuation of Appearances See Inside Cover)*

Linda Zacher, Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, Schwab U.S. Dollar Liquid Assets Fund, Schwab Money Market Fund, Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Cash Reserves, Schwab Advisor Cash Reserves, Charles Schwab Bank, N.A., Charles Schwab & Co., Inc., Charles Schwab Corporation, Schwab YieldPlus Fund, Schwab YieldPlus Fund Liquidation Trust, 33-35 Green Pond Road Associates, LLC, on behalf of itself and all others similarly situated, FTC Futures Fund PCC Ltd, on behalf of themselves and all others similarly situated, FTC Futures Fund SICAV, on behalf of themselves and all others similarly situated, Metzler Investment GmbH, on behalf of itself and all others similarly situated, 303030 Trading LLC, Atlantic Trading USA, LLC, Gary Francis, Nathaniel Haynes, Courtyard at Amwell II, LLC, Greenwich Commons II, LLC, Jill Court Associates II, LLC, Maidencreek Ventures II LP, Raritan Commons, LLC, Lawrence W. Gardner, on behalf of themselves and all others similarly situated, Mayor and City Council of Baltimore, City of New Britain Firefighters' and Police Benefit Fund, on behalf of itself and all others similarly situated, Texas Competitive Electric Holdings Company LLC, Guaranty Bank & Trust Company, Individually and on behalf of all others similarly situated, National Credit Union Administration Board, as Liquidating Agent of U.S. Central Federal Credit Union, Western Corporate Federal Credit Union, Members United Corporate Federal Credit Union, Southwest Corporate Federal Credit Union, and Constitution Corporate Federal Credit Union, City of Philadelphia, Pennsylvania Intergovernmental Cooperation Authority, Darby Financial Products, Capital Ventures International, Salix Capital US Inc., Prudential Investment Portfolios 2, FKA Dryden Core Investment Fund, on behalf of Prudential Core Short-Term Bond Fund, Prudential Core Taxable Money Market Fund, City of Riverside, Riverside Public Financing Authority, East Bay Municipal Utility District, County of San Mateo, San Mateo County Joint Powers Financing Authority, City of Richmond, Richmond Joint Powers Financing Authority, Successor Agency to the Richmond Community Redevelopment Agency, County of San Diego, County of Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the county of Sonoma for and on behalf of the Sonoma County Treasury Pool Investment, Regents of the University of California, San Diego Association of Governments, County of Sacramento, The County of Mendocino, City of Houston, Bay Area Toll Authority, Joseph Amabile, Louie Amabile, individually & on behalf of Lue Trading, Inc., Norman Byster, Michael Cahill, Richard Deogracias, individually on behalf of RCD Trading, Inc., Marc Federighi, individually on behalf of MCO Trading, Scott Federighi, individually on behalf of Katsco, Inc., Robert Furlong, individually on behalf of XCOP, Inc., David Cough, Brian Haggerty, individually on behalf of BJH Futures, Inc., David Klusendorf, Ronald Krug, Christopher Lang, John Monckton, Philip Olson, Brett Pankau, David Vecchione, individually on behalf of Vecchione & Associates, Randall Williams, John Henderson, 303 Proprietary Trading LLC, Margery Teller, Nicholas Pesa, Eduardo Restani, Vito Spillone, Prudential Investment Portfolios 2, FKA Dryden Core Investment Fund, on behalf of Prudential Core Short-Term Bond Fund, Prudential Core Taxable Money Market Fund, Salix Capital US Inc., Darby Financial Products, Capital Ventures International, City of Philadelphia, Pennsylvania Intergovernmental Cooperation Authority, FTC Futures Fund PCC Ltd. on behalf of themselves and all others similarly situated, FTC Futures Fund SICAV, on behalf of themselves

and all others similarly situated, Metzler Investment GmbH, on behalf of itself
and all others similarly situated, 303030 Trading LLC, Atlantic Trading USA,
LLC, Gary Francis, Nathaniel Haynes, City of New Britain Firefighters' and
Police Benefit Fund, on behalf of itself and all others similarly situated, Mayor
and City Council of Baltimore, Texas Competitive Electric Holdings Company
LLC, Regents of the University of California, East Bay Municipal Utility District,
San Diego Association of Governments, City of Richmond, Richmond Joint
Powers Financing Authority, Successor Agency to the Richmond Community
Redevelopment Agency, City of Riverside, Riverside Public Financing Authority,
County of Sacramento, County of San Diego, County of San Mateo, County of
Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the county
of Sonoma for and on behalf of Sonoma County Treasury Pool Investment,
City of Houston,

*Plaintiffs-Appellants,*

FTC Capital GMBH, on behalf of themselves and all others similarly situated,
FTC Futures Fund PCC Ltd, on behalf of themselves and all others similarly
situated, FTC Futures Fund SICAV, on behalf of themselves and all others
similarly situated, Carpenters Pension Fund of West Virginia, City of Dania
Beach Police & Firefighters' Retirement System, Individually and on behalf of all
others similarly situated, Ravan Investments, LLC, Mayor and City Council of
Baltimore, Richard Hershey, Jeffrey Laydon, on behalf of himself and all others
similarly situated, Metzler Investment GmbH, on behalf of itself and all others
similarly situated, Roberto E. Calle Gracey, City of New Britain Firefighters' and
Police Benefit Fund, on behalf of itself and all others similarly situated, AVP
Properties, LLC, 303030 Trading LLC, Atlantic Trading USA, LLC, Community
Bank & Trust, Berkshire Bank, Individually and On Behalf of All Others
Similarly Situated, 33-35 Green Pond Road Associates, LLC, on behalf of itself
and all others similarly situated, Elizabeth Lieberman, on behalf of themselves
and all others similarly situated, Todd Augenbaum, on behalf of themselves and
all others similarly situated, Gary Francis, Nathaniel Haynes, Courtyard at
Amwell II, LLC, Greenwich Commons II, LLC, Jill Court Associates II, LLC,
Maidencreek Ventures II LP, Raritan Commons, LLC, Lawrence W. Gardner, on
behalf of themselves and all others similarly situated, Annie Bell Adams, on
behalf of herself and all others similarly situated, Dennis Paul Fobes, on behalf of
himself and all others similarly situated, Leigh E. Fobes, on behalf of herself and
all others similarly situated, Margaret Lambert, on behalf of herself and all others
similarly situated, Betty L. Gunter, on behalf of herself and all others similarly
situated, Government Development Bank for Puerto Rico, Carl A. Payne,
individually, and on behalf of other members of the general public similarly
situated, Kenneth W. Coker, individually, and on behalf of other members of the
general public similarly situated, City of Riverside, Riverside Public Financing
Authority, East Bay Municipal Utility District, County of San Mateo, San Mateo
County Joint Powers Financing Authority, City of Richmond, Richmond Joint
Powers Financing Authority, Successor Agency to the Richmond Community
Redevelopment Agency, County of San Diego, Guaranty Bank & Trust Company,
Individually and on behalf of all others similarly situated, Heather M. Earle, on
behalf of themselves and all others similarly situated, Henryk Malinowski, on
behalf of themselves and all others similarly situated, Linda Carr, on behalf of
themselves and all others similarly situated, Eric Friedman, on behalf of
themselves and all others similarly situated, County of Riverside, Jerry Weglarz,
Nathan Weglarz, on behalf of plaintiffs and a class, Directors Financial Group,

individually and on behalf of all others similarly situated, SEIU Pension Plans Master Trust, individually and on behalf of all others similarly situated, Highlander Realty, LLC, Jeffrey D. Buckley, Federal Home Loan Mortgage Corporation, County of Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the county of Sonoma for and on behalf of the Sonoma County Treasury Pool Investment, Regents of the University of California, San Diego Association of Governments, CEMA Joint Venture, County of Sacramento, City of Philadelphia, Pennsylvania Intergovernmental Cooperation Authority, Principal Funds, Inc., PFI Bond & Mortgage Securities Fund, PFI Bond Market Index Fund, PFI Core Plus Bond I Fund, PFI Diversified Real Asset Fund, PFI Equity Income Fund, PFI Global Diversified Income Fund, PFI Government & High Quality Bond Fund, PFI High Yield Fund, PFI High Yield Fund I, PFI Income Fund, PFI Inflation Protection Fund, PFI Short-Term Income Fund, PFI Money Market Fund, PFI Preferred Securities Fund, Principal Variable Contracts Funds, Inc., PVC Asset Allocation Account, PVC Money Market Account, PVC Balanced Account, PVC Bond & Mortgage Securities Account, PVC Equity Income Account, PVC Government & High Quality Bond Account, PVC Income Account, PVC Short-Term Income Account, Principal Financial Group, Inc., Principal Financial Services, Inc., Principal Life Insurance Company, Principal Capital Interest Only I, LLC, Principal Commercial Funding, LLC, Principal Commercial Funding II, LLC, Principal Real Estate Investors, LLC, Texas Competitive Electric Holdings Company LLC, Salix Capital Ltd.,

*Plaintiffs,*

– v. –

Bank of America Corporation, Barclays Bank Plc., Citibank NA, Credit Suisse Group AG, Deutsche Bank AG, HSBC Holdings plc., J.P. Morgan Chase & Co., Norinchukin Bank, UBS AG, WestLB AG, Rabobank Group, Does 1-10, HBOS PLC, Bank of Tokyo-Mitsubishi UFJ, Ltd, Royal Bank of Canada, Societe Generale, Deutsche Bank Financial LLC, Deutsche Bank Securities Inc., Bank of America, N.A., National Association, JPMorgan Chase & Co., HSBC Bank PLC, WestDeutsche Immobilienbank AG, Citigroup Inc., Cooperatieve Centrale RaiffeisenBoerenleenbank B.A., JPMorgan Chase Bank, National Association, JPMorgan Chase Bank, Barclays Bank PLC, Lloyds Banking Group PLS, HSBC Holding plc, Lloyds Banking Group PLS, JPMorgan Chase Bank N.A., Citigroup, Inc., Citibank N.A., Bank of Tokyo-Mitsubishi UFJ, Ltd., Cooperative Centrale-Raiffeisenboernleenbank B.A., JPMorgan Chase Bank N.A., Royal Bank of Scotland, Plc, Stephanie Nagel, British Bankers' Association, BBA Enterprises, Ltd, BBA Libor, Ltd, Portigon AG, John Does #1-#5, Lloyds TSB Bank plc, National Collegiate Trust, Chase Bank USA, N.A., Credit Suisse Group, AG, Citibank, N.A., UBS Securities LLC, J.P. Morgan Clearing Corp., Bank of America Securities LLC, Bank of Tokyo-Mitsubishi UFJ, JPMorgan & Co., Bank of America N.A., Centrale Raiffeisen-Berenleenbank B.A., UBS AG, Royal Bank of Scotland Group PLC, Societe General, Royal Bank of Canada, Bank of Nova Scotia, Bank of Tokyo Mitsubishi UFJ Ltd., Chase Bank USA, NA, Royal Bank of Scotland, JPMorgan Chase Bank National Association, Royal Bank of Scotland Group Plc.,

*Defendants-Appellees,*

Lloyds Banking Group plc, Credit Agricole, S.A., Royal Bank of Scotland Group PLC, Credit Suisse Group, NA, Barclays Capital Inc., Barclays U.S. Funding LLC, Credit Suisse Securities (USA) LLC, Barclays PLC, Citizens Bank of

Massachusetts, agent of RBS Citizens Bank, NA, RBS Citizens, N.A., FKA Citizens Bank of Massachusetts, RBS Citizens, N.A., incorrectly sued as the Charter One Bank NA, BNP Paribas S.A., Sumitomo Mitsui Banking Corp., Citigroup Global Markets Inc., HSBC Securities (USA) Inc.,

*Defendants.*

---

DAVID KOVEL
KIRBY MCINERNEY LLP
825 Third Avenue, 16th Floor
New York, New York 10022
(212) 371-6600

– and –

CHRISTOPHER LOVELL
LOVELL STEWART HALEBIAN
   JACOBSON LLP
61 Broadway, Suite 501
New York, New York 10006
(212) 608-1900

*Interim Co-Lead Counsel for Exchange-*
   *Based Plaintiffs-Appellants and the*
   *Class in Case No. 15-454*

WILLIAM CHRISTOPHER CARMODY
ARUN SUBRAMANIAN
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, New York 10022
(212) 336-8330

– and –

MARC SELTZER
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067
(310) 789-3100

– and –

MICHAEL D. HAUSFELD
WILLIAM P. BUTTERFIELD
HILARY K. SCHERRER
NATHANIEL C. GIDDINGS
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 540-7200

*Counsel for Plaintiffs-Appellants*
   *Baltimore, New Britain and TCEH*
   *and Interim Lead Counsel for the*
   *Proposed OTC Plaintiff Class in*
   *Case No. 15-498*

STEVEN E. FINEMAN
MICHAEL J. MIARMI
LIEFF, CABRASER, HEIMANN
   & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013
(212) 355-9500

– and –

BRENDAN P. GLACKIN
LIEFF, CABRASER, HEIMANN &
   BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
(415) 956-100

*Counsel for Plaintiffs-Appellants The
Charles Schwab Corporation, Charles
Schwab Bank, N.A., Charles Schwab
& Co., Inc., Schwab Money Market
Fund, Schwab Value Advantage
Money Fund, Schwab Retirement
Advantage Money Fund, Schwab
Investor Money Fund, Schwab Cash
Reserves, Schwab Advisor Cash
Reserves, Schwab YieldPlus Fund,
Schwab YieldPlus Fund Liquidation
Trust, Schwab Short-Term Bond
Market Fund, Schwab Total Bond
Market Fund and Schwab U.S. Dollar
Liquid Assets Fund in Case No. 15-
432 and for Bay Area Toll Authority in
Case No. 15-778*

NANCI E. NISHIMURA
MATTHEW K. EDLING
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road
Burlingame, California 94010
(650) 697-6000

– and –

ALEXANDER E. BARNETT
COTCHETT, PITRE & MCCARTHY, LLP
40 Worth Street, 10th Floor
New York, New York 10013
(212) 201-6820

*Counsel for Plaintiffs-Appellants The
Regents of the University of
California, East Bay Municipal
Utility District, San Diego
Association of Governments, City of
Richmond, The Richmond Joint
Powers Financing Authority,
Successor Agency to the Richmond
Community Redevelopment Agency,
City of Riverside, The Riverside
Public Financing Authority, County
of Mendocino, County of
Sacramento, County of San Diego,
County of San Mateo, The San
Mateo County Joint Powers
Financing Authority, County of
Sonoma and David E. Sundstrom, in
his official capacity as Treasurer of
the County of Sonoma in Case No.
15-733*

RICHARD W. MITHOFF
WARNER V. HOCKER
MITHOFF LAW FIRM
One Allen Center
Penthouse, Suite 3450
Houston, Texas 77002
(713) 654-1122

– and –

NANCI E. NISHIMURA
MATTHEW K. EDLING
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road
Burlingame, California 94010
(650) 697-6000

– and –

ALEXANDER E. BARNETT
COTCHETT, PITRE & MCCARTHY, LLP
40 Worth Street, 10th Floor
New York, New York 10013
(212) 201-6820

*Counsel for Plaintiff-Appellant City of
Houston in Case No. 15-744*

STEIG D. OLSON
DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiffs-Appellants
The City of Philadelphia and
The Pennsylvania Intergovernmental
Cooperation Authority in Case No. 15-
547*

DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
STEIG D. OLSON
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiffs-Appellants
Darby Financial Products and
Capital Ventures International in
Case No. 15-551*

DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
STEIG D. OLSON
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiff-Appellant Salix
Capital US Inc. in Case Nos. 15-611
and 15-620*

DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
STEIG D. OLSON
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiffs-Appellants
Prudential Investment Portfolios 2
on behalf of Prudential Core Short-
Term Bond Fund and Prudential
Core Taxable Money Market Fund
in Case No. 15-627*

DAVID C. FREDERICK
WAN J. KIM
GREGORY G. RAPAWY
ANDREW C. SHEN
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900

*Counsel for Plaintiff-Appellant National
    Credit Union Administration Board in
    Case No. 15-537*

MICHAEL J. GUZMAN
ANDREW C. SHEN
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900

– and –

STUART H. MCCLUER
MCCULLEY MCCLUER PLLC
1223 Jackson Avenue East, Suite 200
Oxford, Mississippi 38655
(662) 550-4511

*Counsel for Plaintiff-Appellant Guaranty
    Bank & Trust Company in Case No.
    15-524*

JEFFREY A. SHOOMAN
LITE DEPALMA GREENBERG, LLC
Two Gateway Center, Suite 1201
Newark, New Jersey 07102
(973) 623-3000

*Counsel for Plaintiff-Appellant 33-35
Green Pond Associates, LLC in Case No.
15-441*

SCOTT P. SCHLESINGER
JEFFREY L. HABERMAN
JONATHAN R. GDANSKI
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Ft. Lauderdale, Florida 33316
(954) 320-9507

*Counsel for Plaintiffs-Appellants
    Amabile, et al. in Case No. 15-825*

JASON A. ZWEIG
HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Suite 1700
New York, New York 10017
(212) 752-5455

*Counsel for Plaintiffs-Appellants
    Courtyard At Amwell, LLC,
    Greenwich Commons II, LLC, Jill
    Court Associates II, LLC,
    Maidencreek Ventures II LP,
    Raritan Commons, LLC and
    Lawrence W. Gardner in Case No.
    15-477*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App P. 26.1, counsel for plaintiffs-appellants state as follows:

## Exchange-Based Plaintiffs-Appellants

None of Metzler Investment GmbH, FTC Futures Funds SICAV, FTC Futures Fund PCC Ltd., Atlantic Trading USA, LLC, and 303030 Trading LLC has a parent corporation, and no publicly held corporation owns 10% or more of any of their stock.

Atlantic Trading USA, LLC is 100% owned by Atlantic Trading Holdings, LLC (a non-public Illinois limited liability company). No publicly held corporation owns 10 percent or more of any of Atlantic Trading Holdings, LLC's stock.

## OTC Plaintiffs-Appellants

City of New Britain Firefighters' and Police Benefit Fund has no parent corporation. No publicly held corporation owns 10% or more of its stock.

Texas Competitive Electric Holdings Company LLC identifies the following direct and indirect parent companies: Energy Future Competitive Holdings Company LLC, Energy Future Holdings Corp., and Texas Energy Future Holdings Limited Partnership. No publicly held corporation owns 10% or more of Texas Competitive Electric Holdings Company LLC's stock.

**Schwab Plaintiffs-Appellants**

Schwab Money Market Fund, Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Cash Reserves, Schwab Advisor Cash Reserves, Schwab YieldPlus Fund, and Schwab YieldPlus Fund Liquidation Trust (the "Schwab Mutual Fund Appellants") are independently managed mutual funds advised by Charles Schwab Investment Management Inc. None of the Schwab Mutual Fund Appellants has a parent corporation, and no publicly held company owns 10% or more of any Schwab Mutual Fund Appellant's ownership interests.

Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, and Schwab U.S. Dollar Liquid Assets Fund (the "Schwab Fund Appellants") are independently managed funds advised by Charles Schwab Investment Management Inc. None of the Schwab Fund Appellants has a parent corporation, and no publicly held company owns 10% or more of any Schwab Fund Appellant's ownership interests.

The Charles Schwab Corporation is the parent company of Charles Schwab Investment Management Inc.; Charles Schwab Bank, N.A.; and Schwab Holdings, Inc.

Schwab Holdings, Inc. is the parent company of Charles Schwab & Co., Inc.

The Charles Schwab Corporation is a publicly traded company.  No publicly held corporation owns 10% or more of the stock of The Charles Schwab Corporation.

### 33-35 Green Pond Road Associates, LLC

33-35 Green Pond Road Associates, LLC has no parent corporation.  No publicly held corporation owns 10% or more of 33-35 Green Pond Road Associates, LLC's ownership interests.

### Guaranty Bank & Trust Company

Guaranty Bank & Trust Company is a wholly owned subsidiary of Guaranty Capital Corporation.   Guaranty Capital Corporation does not have a parent corporation, and no publicly held corporation owns 10% or more of Guaranty Capital Corporation's stock.

### 303 Proprietary Trading LLC

303 Proprietary Trading LLC has no parent corporation.  No publicly held corporation owns 10% or more of its stock.

### Courtyard at Amwell II, LLC, Greenwich Commons II, LLC, Jill Court Associates II, LLC, Maidencreek Ventures II LP, and Raritan Commons, LLC

None of Courtyard at Amwell II, LLC, Greenwich Commons II, LLC, Jill Court Associates II, LLC, and Raritan Commons, LLC, or Maidencreek Ventures

II LP, has a parent corporation. No publicly held corporation owns 10% or more of any of these Appellants' ownership interests.

### Salix Capital US Inc.

Salix Capital US Inc. is Delaware corporation not owned by any parent corporation. No publicly held corporation owns 10% or more of its stock.

### Prudential

Prudential Investment Portfolios 2, f/k/a Dryden Core Investment Fund, o/b/o Prudential Core Short-Term Bond Fund and Prudential Core Taxable Money Market Fund is a Delaware statutory trust not owned by any parent corporation. No publicly held corporation owns 10% or more of its stock.

### Darby Financial Products

Darby Financial Products ("DFP") is a Delaware general partnership. DFP is wholly-owned by two partners: Susquehanna International Group, LLP, a Delaware limited liability partnership, and Susquehanna Fixed Income, Inc., a Pennsylvania corporation. No publicly held corporation holds an interest of 10% or more in DFP.

### Capital Ventures International

Capital Ventures International ("CVI") is a Cayman Islands Exempted Company. CVI is wholly-owned by CVI Holdings, LLC, a Delaware limited

liability company.  No publicly held corporation owns 10% or more of CVI's stock.

Page

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ............................................................... viii

PRELIMINARY STATEMENT ..........................................................1

JURISDICTION...................................................................................4

ISSUES PRESENTED...........................................................................5

STATEMENT OF THE CASE.................................................................5

I.    Factual Background ....................................................................5

      A.    LIBOR and the BBA. ..........................................................5

      B.    Defendants' violation of the BBA rules and manipulation of
            LIBOR to their benefit. ....................................................11

            1.    Direct evidence from governmental investigations. ................13

            2.    Statistical and econometric evidence of manipulation. ............17

      C.    The plaintiffs and their injuries. ..........................................19

II.   Procedural History ...................................................................19

SUMMARY OF ARGUMENT ...............................................................22

STANDARD OF REVIEW ...................................................................24

ARGUMENT .......................................................................................24

I.    The District Court Erred In Holding That Plaintiffs Failed To Allege
      Antitrust Injury .........................................................................24

      A.    Plaintiffs allege the prototypical form of antitrust injury. ..................24

            1.    Price fixing is the paradigmatic antitrust violation...................27

            2.    Plaintiffs received fixed prices.................................................32

3.     Receiving fixed prices is the quintessential antitrust injury. ........................................................................32

B.     The district court's contrary conclusion rests on fundamental legal errors. ..........................................................36

     1.     The district court misapplied Brunswick and ARCO, which in fact support plaintiffs' claim of antitrust injury. ........37

     2.     The cooperative aspects of the LIBOR-setting process do not invalidate claims of anticompetitive harm—they make them more likely. ...........................................................41

     3.     Defendants' agreement to manipulate LIBOR was manifestly anticompetitive, not merely fraudulent. ..................47

     4.     Further competition over "spreads" is irrelevant. ....................54

     5.     The district court's "hypothetical" test for antitrust injury is flawed and inconsistent with the per se rule. ........................56

II.     To The Extent Any Amendment Of The Complaints Was Necessary, The District Court Erred In Denying Leave To Amend ...............................59

CONCLUSION ...................................................................62

CERTIFICATE OF COMPLIANCE ....................................................73

# TABLE OF AUTHORITIES

**Page**

## Cases

*7 West 57th St. Realty Co., LLC v. Citigroup, Inc.*,
    2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015)....................................................35

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988).....................................................................43, 44, 46, 49

*In re Aluminum Warehousing Antitrust Litig.*,
    2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015)..................................................49

*Am. Column & Lumber Co. v. United States*,
    257 U.S. 377 (1921)...................................................................................7, 43

*Am. Soc. Of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
    456 U.S. 556 (1982)........................................................................................44

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) .......................................................24, 47, 55, 59

*Ariz. v. Maricopa County Medical Soc.*,
    457 U.S. 332 (1982)........................................................................................44

*Atl. Richfield Co. v. USA Petroleum Co. ("ARCO")*,
    495 U.S. 328 (1990)...............................................................21, 25, 38, 39, 40

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................47

*Blue Shield of Virginia v. McCready*,
    457 U.S. 465 (1982)........................................................................................40

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
    441 U.S. 1 (1979)...........................................................................................27

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)..................................................2, 22, 25, 26, 37, 38

*In re Cardizem CD Antitrust Litig.*,
    332 F.3d 896 (6th Cir. 2003) ........................................................................57

*Catalano, Inc. v. Target Sales, Inc.*,
446 U.S. 643 (1980)........................................................1, 26, 29, 30, 55

*City of Long Beach v. Standard Oil*,
872 F.2d 1401 (9th Cir. 1989) ...........................................................52

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984)....................................................................27, 46

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007) ..........................................................33, 41

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009) .............................................3, 26, 33, 41

*Daniel v. Am. Bd. of Emergency Med.*,
428 F.3d 408 (2d Cir. 2005) ........................................................28, 32

*Digital Distrib. Inc. v. CEMA Distrib.*,
1997 U.S. App. LEXIS 16815 (9th Cir. July 3, 1997) ......................27

*FTC v. Cement Institute*,
333 U.S. 683 (1948)...........................................................................55

*FTC v. Pacific States Paper Trade Assoc.*,
273 U.S. 52 (1927).............................................................................44

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004) ........................................................29, 54

*Foman v. Davis*,
371 U.S. 178 (1962)...................................................................... 59-61

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*
2015 WL 363894 (S.D.N.Y. Jan. 28, 2015) *(FOREX)*........ 26, 27, 34, 37, 51, 56

*Gatt Commc'ns., Inc. v. PMC Assocs., L.L.C.*,
711 F.3d 68 (2d Cir. 2013) ......................................................24,25, 28

*Gelboim v. Bank of Am. Corp.*,
135 S. Ct. 897 (2015)..............................................................4, 8, 20

*Goldfarb v. Va. State Bar*,
421 U.S. 773 (1975)........................................................................44

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ........................................................54

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
253 F. Supp. 2d 262 (D. Conn. 2003)..........................................29

*Indian Head, Inc. v. Allied Tube & Conduit Corp.*,
817 F.2d 938 (2d Cir. 1987) .........................................................45

*Irvin Indus., Inc. v. Goodyear Aerospace Corp.*,
974 F.2d 241 (2d Cir. 1992) .........................................................57

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ............................. 26, 29, 29, 33, 51, 52

*Laydon v. Mizuho Bank, Ltd.*,
2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)..............................35

*Loeb Industries, Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002) ........................................................33

*Major League Baseball Properties v. Salvino*,
542 F.3d 290 ..................................................................................50

*Maple Flooring Mfrs. Ass'n. v. United States*,
268 U.S. 563 (1925)....................................................................7, 43

*NCAA v. Bd. of Regents of Uni. of Okla.*,
468 U.S. 85 (1984)......................................................................27, 32

*Nat'l Soc. of Prof. Eng'rs v. United States*,
435 U.S. 679 (1978)....................................................................42, 55

*Oliver Schools, Inc. v. Foley*,
930 F.2d 248 (2d Cir. 1991) .........................................................59

*Ostrofe v. H.S. Crocker Co., Inc.*,
740 F.2d 739 (9th Cir. 1984) ........................................................41

*Pace Elecs., Inc. v. Canon Computer Sys.*,
   213 F.3d 118 (3d Cir. 2000) ...............................................................23, 28, 40

*Plymouth Dealers' Ass'n of N. Cal. v. United States*,
   279 F.2d 128 (9th Cir. 1960) ...........................................................29, 54

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51 (2d Cir. 2012) ...........................................................2, 27, 32

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   587 F. Supp. 2d 27 (D.D.C. 2008) ....................................................29

*Reiter v. Sonotone Corporation*,
   442 U.S. 330 (1979)...........................................................................33

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010) ....................................................12, 50

*State Teachers Ret. Bd. v. Fluor Corp.*,
   654 F.2d 843 (2d Cir. 1981) ...........................................................61

*Sugar Institute v. United States*,
   297 U.S. 553 (1936)...........................................................................55

*Todd v. Exxon*,
   275 F.3d 191 (2d Cir. 2001) ...........................................................7, 33, 41

*US Gypsum Co. v. Indiana Gas Co., Inc.*,
   350 F.3d 623 (7th Cir. 2003) ....................................................25, 33

*United States v. Heilbroner*,
   100 F.2d 379 (2d Cir. 1938) ...........................................................19

*United States v. Nat. Ass'n of Real Estate Bds.*,
   339 U.S. 485 (1950)...........................................................................44

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)............................... 1, 2, 23, 27, 28, 30, 31, 34, 49, 50, 53, 54

*United States v. United States Gypsum Co.*,
   438 U.S. 422 (1978)...........................................................................30

*Williams v. Citigroup Inc.*,
    659 F.3d 208 (2d Cir. 2011) ........................................................59, 61

*Woods Exploration & Producing Co. v. ALCOA*,
    438 F.2d 1286 (5th Cir. 1971) ...............................................53

*In re Yarn Processing Patent Validity Litig.*,
    541 F.2d 1127 (5th Cir. 1976) ...............................................29

## Statutes

15 U.S.C. §1 ........................................................................4, 50

15 U.S.C. §15 ......................................................................4

28 U.S.C. §1291 ..................................................................4

28 U.S.C. §1331 ..................................................................4

28 U.S.C. §1337 ..................................................................4

Federal Rule of Civil Procedure 12(b)(6) ......................24, 61

Federal Rule of Civil Procedure 15(a)(2) ......................59

Federal Rule of Civil Procedure 58(c)(2)(B) ..................4

## Miscellaneous

2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (Areeda &
    Hovenkamp) ¶335f (3d ed. 2010) ...........................................35

2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (Areeda &
    Hovenkamp) ¶391b (3d ed. 2010) ...................................2, 23, 34

12 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (Areeda &
    Hovenkamp) ¶2022a (3d ed. 2010) ............................1, 29

Antitrust Guidelines for Collaborations Among Competitors (FTC/DOJ, April
    2000) ........................................................................43, 48

Ben Protess et al., *Deutsche Bank to Pay $2.5 Billion Fine to Settle Rate-Rigging
    Case*, N.Y. TIMES, April 23, 2015........................................14

*Herbert Hovenkamp & Christopher R. Leslie, The Firm as Cartel Manager,*
    64 Vand. L. Rev. 813 (2011) ........................................................................44

Sharon E. Foster, *Harm to Competition and the Competitive Process:*
    *A Circular Charade in the LIBOR Antitrust Litigation*, 10 B.Y.U. Int'l L. &
    Mgmt. Rev. 91 (2015) ..............................................................................42

## PRELIMINARY STATEMENT

Defendant-appellees, sixteen of the world's largest banks, secretly conspired to fix the London Interbank Offered Rate (LIBOR). LIBOR is an interest-rate benchmark that serves as a key price component in many financial instruments in the markets in which defendants compete with one another. Plaintiff-appellants, who hold these kinds of LIBOR-based financial instruments, are the direct victims of defendants' collusive price manipulation. They alleged that defendants' secret conspiracy to manipulate LIBOR caused them financial harm in the form of less favorable prices—the most straightforward possible antitrust suit under Sherman Act Section 1.

The law is clear that agreements among horizontal competitors to fix a component of price are so inherently anticompetitive that they constitute *per se* violations of the Sherman Act. *See Catalano, Inc. v. Target Sales, Inc*., 446 U.S. 643, 647 (1980); *see also* 12 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (Areeda & Hovenkamp) ¶2022a (3d ed. 2010) ("The per se rule generally governs not only explicit price fixing but also agreements to fix a 'price element.'"). This well-established principle specifically includes cases in which defendants tamper with the price structure of a market by colluding to alter a benchmark incorporated into contracts prevalent in that market. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940).

The district court (Buchwald, J.) nonetheless dismissed all the antitrust claims at issue, finding a lack of "antitrust injury." The rationale, however, was not about any lack of connection between these particular plaintiffs' injuries and the alleged harm to competition—as it usually is when antitrust injury is at issue. Instead, the rationale was that *no* plaintiff could allege antitrust injury because defendants' collusive manipulation of LIBOR did not harm competition at all. That holding is contrary to bedrock antitrust law.

In fact, this is an "easy case" of antitrust injury. Areeda & Hovenkamp ¶391b. As victims of defendants' horizontal price fixing, plaintiffs plainly allege an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Indeed, plaintiffs' injuries flowed as directly as possible from the single most fundamental violation in all of antitrust law: A price-fixing cartel. Under long-standing law, "[a]ny combination which tampers with price structures," regardless of the means or "machinery employed," is a *per se* violation of Sherman Act Section 1, *Socony*, 310 U.S. at 221-23, and as such, is conclusively presumed to harm competition, *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 67 (2d Cir. 2012). In keeping with the *per se* rule, no prior case had ever allowed horizontal price-fixers to successfully argue that their

collusion somehow avoided harming competition, and, for that reason, caused no antitrust injury to any possible plaintiff.

The decision below was the first to do so, but to get there, it was forced to jettison fundamental tenets of antitrust law—to the point of suggesting that "collusion" among these banks might not have been "anticompetitive." SPA32-33. This rationale for finding a lack of antitrust injury not only contradicts the *per se* rule, but runs into a brick wall of antitrust-injury precedent as well. *See, e.g.*, *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (plaintiffs "plainly" allege antitrust injury where they "are purchasers of the defendants' product who allege being forced to pay supra-competitive prices"). To hold that these complaints cannot allege antitrust injury is to hold that defendants' collusive manipulation of prices in markets where they compete is somehow not even an antitrust problem. That cannot be right: It would condemn civil and criminal enforcement alike, including price-fixing charges the Department of Justice has lodged against some of these defendants. The decision below thus not only conflicts with the antitrust-injury rulings of the Supreme Court, this Court, and other Circuits, but threatens far greater harm to antitrust enforcement as a whole.

# JURISDICTION

These actions concern violations of Sherman Act Section 1, 15 U.S.C. §1. District court jurisdiction arose under 28 U.S.C. §§1331, 1337 and 15 U.S.C. §15.

This brief is joined by multiple appellants. *See* Doc. 231 at 2. As to the Bondholder class (No. 13-3565), the complaint was dismissed in full on March 29, 2013, SPA1-161; judgment was entered under Rule 58(c)(2)(B) on August 26, 2013; and plaintiffs timely noticed their appeal on September 17, 2013. JA1176. This Court initially dismissed, *see* Doc. 120, but the Supreme Court reversed, holding that this Court has jurisdiction under 28 U.S.C. §1291. *See Gelboim v. Bank of Am. Corp.*, 135 S. Ct. 897 (2015).

The district court responded to *Gelboim* by entering final or partial final judgments dismissing the other appellants' antitrust claims. For the class action cases (Nos. 15-441, -454, -477, -494/-498, and -524), corrected judgments were entered February 17, 2015, SPA304, and appeals noticed on or before February 26, 2015 (JA1596-1614, JA1628-30). For the non-class cases (Nos. 15-537, -547, -551, -611/-620, -627, -733, -744, -778, and -825/-830), judgments were entered February 23, 2015, SPA307, and appeals noticed on or before March 19, 2015. JA1615-25, 1631-45. This Court has jurisdiction over these cases under 28 U.S.C. §1291.

Finally, as to the *Schwab* case (No. 15-432), final judgment was entered on August 26, 2013.  A timely notice of appeal was filed on September 24, 2013, *see* JA1385, and a second notice was filed on February 10, 2015, after *Gelboim* was issued, *see* JA1589-95.  Defendants have nonetheless moved to dismiss Schwab's appeal; this brief incorporates the arguments in Schwab's opposition to that motion.  *See* No. 15-432, Doc. 487.

## ISSUES PRESENTED

1. Did plaintiffs plausibly allege antitrust injury?

2. Did the district court err in denying certain plaintiffs leave to amend their complaints?

## STATEMENT OF THE CASE

### I.     Factual Background

### A.     LIBOR and the BBA.

The defendants in this case are banks, all of which belonged to the British Bankers' Association (BBA).  The BBA is the leading trade association for the U.K. financial-services sector, and is mostly a lobbying organization.  It has no regulatory function or governmental oversight.  Instead, it is a purely private association of horizontal competitors (that is, firms that compete directly in the same markets), governed by senior executives from those firms.  First Amended

Bondholders' Complaint ("Bondholders' Compl."), JA203 ¶5; Second Amended

Philadelphia Complaint ("Philadelphia Compl."), JA1408 ¶¶45-46.[1]

In 1986, the BBA began publishing LIBOR as a benchmark interest rate

intended to reflect competitive conditions in the interbank lending market in

London. Bondholders' Compl. JA203, 243 ¶¶5, 83; Philadelphia Compl. JA1405,

1411 ¶¶38, 53. The process for setting LIBOR works as follows. Each business

day, a panel of banks answers the question: "At what rate could you borrow funds,

were you to do so by asking for and then accepting inter-bank offers in a

reasonable market size just prior to 11 a.m.?" A designated panel for each

currency answers this question for different maturities, resulting in many different

benchmarks. The defendants here are the sixteen panel-member banks whose

survey answers controlled the US Dollar LIBOR benchmark. Thompson Reuters

collected and published this information for the BBA, calculating the LIBOR

benchmark as the mean of the middle eight submissions. Bondholders' Compl.

JA203-05 ¶¶6-7.

---

[1] For brevity, this brief cites illustrative allegations from the various complaints. Defendants have stipulated that the complaints are functionally identical as to the antitrust causes of action. *See* Motion to Consolidate, Doc. 221 at 6 ("the MDL complaints … for purposes of the appeals are in all material respects the same").

Antitrust law has long recognized the dangers lurking in this kind of sharing and publication of price information, especially when done through an unregulated trade group consisting of horizontal competitors. *See, e.g.*, *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 410-12 (1921); *Todd v. Exxon*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.) (allegation that horizontal competitors agreed to share price information sufficed to allege unreasonable restraint of trade). But the law also recognizes that such arrangements can serve legitimate purposes by improving market transparency and efficient pricing, and so will permit them if (and only if) they are designed to avoid a slide into illegal price fixing. *See, e.g.*, *Maple Flooring Mfrs. Ass'n. v. United States*, 268 U.S. 563, 584-85 (1925); *infra* pp.42-47, 49-50.

The LIBOR-setting process—as it was *intended* to function—has these legitimate purposes. For example, honest benchmark rates facilitate price discovery, allowing lenders and borrowers to avoid the cost of researching borrowing costs themselves. Moreover, moving daily indexes like LIBOR allow parties to enter into floating-rate transactions without having to conduct seriatim negotiations over whether rates have changed. Philadelphia Compl. JA1405, 1411-12 ¶¶38, 53-55. Precisely because LIBOR was reset daily and perceived as reliable, it came to be "a reference point in determining interest rates for financial

instruments in the United States and globally," *Gelboim*, 135 S. Ct. at 903—in the

BBA's own evocative words, the "world's most important number." SPA1.

Accordingly, LIBOR has many uses as a benchmark rate. Issuers of

floating-rate debt (including the defendant banks) commonly set the interest-rate

terms in their instruments as a spread over LIBOR (*i.e.*, LIBOR + X basis points).[2]

Amended Exchange-Based Complaint ("Exch. Compl.") JA294, ¶11. Market

participants also use LIBOR to set and/or evaluate the interest rates offered on

short-term fixed-rate debt. Bondholder Compl. JA205 ¶8. LIBOR is incorporated

into Eurodollar futures contracts as the determinative settlement price term. Exch.

Compl. JA383-84 ¶¶204-06. And LIBOR plays a critical role in "swap"

agreements, where a party pays a fixed rate and receives back a floating rate tied to

LIBOR. Philadelphia Compl. JA1396 ¶¶6-7. Through these and other vehicles, a

host of financial transactions are linked directly to LIBOR.

LIBOR's status as a trusted benchmark stemmed from three key rules

designed to ensure the integrity of the LIBOR-setting process; as the district court

---

[2] The Bondholder class, for example, holds bonds with a floating rate of interest "payable at a rate expressly linked to … LIBOR." Bondholder Compl. JA200 ¶1. As issuers of LIBOR-based bonds, defendants competed with each other (and others) to obtain LIBOR-based debt funding. The central elements of that competition are price (*i.e.*, the interest to be paid to bondholders for use of their funds, which is calculated in terms of LIBOR), and the relative creditworthiness of the issuer.

observed, "it is precisely because LIBOR was thought to accurately represent prevailing interest rates in [the interbank lending] market that it was so widely utilized as a benchmark in financial instruments."  SPA41; *see* Bondholders' Compl. JA211, 282 ¶¶38, 194; Philadelphia Compl. JA1405-07 ¶¶38-42.  The essence of the plaintiffs' complaints is that the banks secretly conspired to violate these rules and manipulate LIBOR, subverting its purpose as a tool for pricing financial transactions based on the *competitive* forces of supply and demand in the interbank lending markets, and turning it instead into a tool for fixing those prices based on *collusion* among the banks.

First, the BBA's published rules required each panel-member bank to truthfully report its projected borrowing costs based solely on its own assessment of the interbank lending market.  Second Consolidated Amended Baltimore Complaint ("Baltimore Compl.") JA1033-34 ¶¶59-60; Second Amended Exchange-Based Complaint ("Second. Exch. Compl.") JA1200-01 ¶65.  As multiple defendants acknowledged in recent non-prosecution agreements with the U.S. Department of Justice, panel-member banks were thus forbidden from misstating their costs.  Philadelphia Compl. JA1405 ¶¶38-39.  This rule was meant to ensure that LIBOR reflected the actual price of borrowing through competition, rather than manipulated prices set through collusion.  *Id.* ¶38.

Second, the BBA mandated that panel-member banks' submissions remain independent and confidential until after the calculation and publication of the daily LIBOR benchmarks.  Exch. Compl. JA304 ¶53.  As several of the defendants have admitted, under the LIBOR rules, "from at least 2005 to the present, each Contributor Panel bank must submit its rate without reference to rates contributed by other Contributor Panel banks."  Baltimore Compl. JA1034 ¶61.  This rule served an obvious but critical purpose:  It prevented collusion by ensuring that the banks could not use advance notice from their competitors to coordinate their submissions.

Finally, the BBA required transparency by simultaneously publishing all the confidential submissions after the benchmark-setting process was completed each day.  Exch. Compl. JA292 ¶6.  This rule was meant to prevent banks from individually misusing the LIBOR process, and to backstop the other two requirements, by making "the process and the individual panel bank submissions transparent on an *ex post* basis, to the capital markets and the panel banks themselves."  Philadelphia Compl. JA1406 ¶41.  Accordingly, a single bank that tried to move LIBOR by submitting artificial "rates that were noticeably lower than the other panel banks would … risk attention from the media or government regulators that could lead to exposure of its illicit submissions."  *Id.* JA1460 ¶195.  This created a powerful incentive against *unilateral* efforts to manipulate LIBOR:

In the absence of collusion, a panel-member bank could expect to be caught red handed making anomalous submissions, which might even result in that bank getting banned from the LIBOR-setting process. *See* Baltimore Compl. JA1039 ¶75.

**B.    Defendants' violation of the BBA rules and manipulation of LIBOR to their benefit.**

In addition to being the US Dollar LIBOR panel members, the defendants are also horizontal competitors in various financial activities—including many transactions expressly tied to LIBOR. Baltimore Compl. JA1161 ¶346. For example, the banks issue LIBOR-based bonds in exchange for cash, borrowing the money at a price (*i.e.*, a total amount of interest) determined explicitly by reference to LIBOR. Bondholders' Compl. JA201, 277 ¶¶1, 167. Additionally, in many swap transactions, the bank receives a fixed income stream in exchange for a variable stream that is likewise tied to LIBOR. Philadelphia Compl. JA1396-97 ¶¶6-8. In all these kinds of transactions, the defendant banks compete to borrow money or purchase income streams as cheaply as possible. As a borrower or purchaser who pays a LIBOR-denominated floating rate, each bank has a substantial interest in keeping LIBOR down. Bondholders' Compl. JA206 ¶11. During the relevant period—stretching from no later than August 2007 to at least May 2010—these banks earned billions of dollars in net interest revenue, and a

rate increase of just 1% would have cost many of the defendant banks several hundreds of millions of dollars each.  *See, e.g.*, *id.* JA239-40 ¶69.

During that same period, defendants were also caught in the teeth of the global financial crisis.  This created a second critical incentive to keep LIBOR low: High published borrowing costs would have signaled to the market that the banks were in poor condition.  Defendants' LIBOR submissions were thus a critical, publicly scrutinized barometer of their health in the years at issue.  *See* Philadelphia Compl. JA1458-60 ¶¶191-96; Baltimore Compl. JA1035-40 ¶¶67-77.

Together, these constituted twin motives to manipulate LIBOR in concert. By working together to submit suppressed LIBOR bids, the defendants could deflate their borrowing costs and inflate their apparent creditworthiness. Bondholders' Compl. JA206, 238-40 ¶¶11, 68-69; Philadelphia Compl. JA1457-60 ¶¶186-96.  Various defendants have admitted acting on these motives in government investigations.  *Id.* JA1459 ¶¶192-94.  Importantly, collusion was indispensable to the effort:  Because of the BBA's transparency rule, a bank attempting to *unilaterally* skew its LIBOR submissions would draw exactly the media and financial-market scrutiny defendants were seeking to avoid.[3]  In the

---

[3]    As courts have often noted, a conspiracy is most likely when parallel actions (like making suppressed LIBOR submissions) would be inconsistent with self-interest if undertaken unilaterally.  *See, e.g.*, *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010).

words of one manager who oversaw his bank's falsification of LIBOR submissions: "[I]n the current environment no bank can be seen as an outlier. The submissions of all banks are published and we could not afford to be significantly away from the pack." *Id.* JA 1460 ¶195. Because LIBOR was reset daily, perceived as reliable, and controlled by defendants in their capacity as panel members, it was the perfect vehicle for these collusive ends. Accordingly, the complaints allege that, no later than August 2007, the panel banks began violating the BBA rules and making coordinated, artificially low submissions in a successful effort to collusively suppress LIBOR for their financial gain. Bondholders' Compl. JA206, 213-17 ¶¶10-11, 44-47.

In addition to the evidence of motive and opportunity above, the complaints identified two other categories of evidence establishing this LIBOR-fixing conspiracy. At this stage, of course, the complaints' allegations must be accepted as true. This evidence is nonetheless summarized briefly here to show the overwhelming *pre-discovery* indicia of a naked price-fixing conspiracy, which makes the pleading-stage dismissal of these antitrust claims entirely anomalous.

### 1. *Direct evidence from governmental investigations.*

Plaintiffs' complaints exhaustively recount the results of numerous governmental investigations into defendants' collusive LIBOR-fixing scheme. Among these are settlements that continue to yield *billions* in penalties and further

information (and admissions) about defendants' egregious misconduct. *See, e.g.*,

Philadelphia Compl. JA1424-57 ¶¶94-184; Ben Protess et al., *Deutsche Bank to*

*Pay $2.5 Billion Fine to Settle Rate-Rigging Case*, N.Y. TIMES, April 23, 2015,

http://www.nytimes.com/2015/04/24/business/dealbook/deutsche-bank-settlement-

rates.html. These include price-fixing allegations with respect to Yen LIBOR in

which the U.S. Department of Justice charged that LIBOR is a "key price

component" in defendants' LIBOR-based financial instruments, making the object

of defendants' conspiracy "to fix the price of *Yen LIBOR-based derivative*

*products* by fixing Yen LIBOR." Baltimore Compl. JA1057-58 ¶¶122-25 (quoting

RBS Criminal Information).[4]

Plaintiffs here assert a structurally identical theory: That defendants

conspired to fix the price of US Dollar LIBOR-based products by fixing US Dollar

LIBOR. Indeed, the allegations here involve nearly all the same players. *Id.*

JA1057-73 ¶¶122-59; Bondholders' Compl. JA203 ¶6 (13 of 16 US Dollar LIBOR

banks are also Yen LIBOR panel members). The only difference between the DOJ

charges and the price fixing alleged by plaintiffs here is the currency.

---

[4]      All criminal charges and deferred prosecution agreements are available on the website of the U.S. Department of Justice Antitrust Division. For RBS, *see* http://www.justice.gov/atr/cases/rbscotland.html. For Deutsche Bank, *see* http://www.justice.gov/atr/cases/f313800/313841.pdf; *and* http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/04/23/db_dpa.pdf.

Among other revelations in these various criminal and regulatory investigations were chat messages and emails among panel-bank employees demonstrating that they knew exactly what was going on. One RBS employee gloated: "It's just amazing how LIBOR fixing can make you that much money … *It's a cartel now in London*." Philadelphia Compl. JA1441 ¶140. Bank employees likewise recognized that LIBOR was "a made up number," and that "the whole street was doing the same" thing to keep the entire "pack" of banks' submissions at artificially low rates. *Id.* JA1436 ¶127. A senior LIBOR submitter at Barclays recognized that the rates he was being asked to submit were "dishonest by definition" and "nowhere near the clearing rates for unsecured cash." Baltimore Compl. JA1043 ¶86a. And, indeed, Barclays was among the banks that admitted to the Justice Department that it made false submissions during the relevant period at the direction of senior management because it believed it would suffer a competitive disadvantage if it did not join the conspiracy. *Id.* JA1042 ¶85.

These facts conclusively demonstrate that the banks were secretly engaged in widespread and simultaneous flouting of the BBA's truthful reporting rule. As one Barclays manager quite vividly conceded: "[T]o the extent that, um, the LIBORs have been understated, are we guilty of being part of the pack? You could say we are." *Id.* JA1427 ¶104.

Even more telling is direct evidence that the banks were violating the independence rule by coordinating their submissions. For example, the U.S. Commodity Futures Trading Commission found that, after Barclays was savaged in the financial press for its relatively high LIBOR submissions, "Senior Barclay's Treasury managers provided the submitters with the general guidance that Barclays's submitted rates should be *within ten basis points* of the submissions by the other U.S. Dollar panel banks." *Id.* JA 1426 ¶100. Regulators also found that Barclays' LIBOR submitters successfully complied with this directive. But there was no way for them to do so absent advance notice of where the other banks would come in. *Id.* JA1425-27, 1431, ¶¶100-03, 114.

Managers at UBS likewise directed submitters, *inter alia*, to stay in "the middle of the pack." Second Exch. Compl. JA1235 ¶104. UBS submitters were uncannily able to comply with this directive, actually submitting daily rates that were *precisely identical* to the subsequently published LIBOR benchmark *for over 200 business days in a row*. *Id.* JA1236 ¶109. The chances that UBS could independently predict, and come in at, the exact LIBOR average over that span of time are non-existent. The only plausible explanation is that UBS knew in advance where the other banks would come in and what each daily reported LIBOR benchmark would be. *See id.* JA1237 ¶110 (expert analyses so finding).

Another clear example comes from an episode at Barclays described in the investigating agencies' settlement documents. On November 29, 2007, each bank substantially increased its LIBOR submission, causing LIBOR to spike. Barclays' submitter initially planned to submit a rate of 5.50, but was overruled by a senior executive on a conference call because "this would have been 20 basis points above the next highest submission." Baltimore Compl. JA1052 ¶108 (quoting FSA findings). A review of the banks' one-month LIBOR submissions that day—information made public only *later*—confirmed that 5.50 was, indeed, *exactly* 20 points higher than the next-highest submission. It is thus clear that Barclays knew what the next-highest submission would be, which is possible only if it knew *every* other panel-bank submission in advance. *Id.* JA1052 ¶109. And Barclays used that information to adjust its own submission and come in lower than a truthful report would have required, *id.*, which is exactly the kind of coordinated price manipulation that the BBA rules (and the antitrust laws) are supposed to prevent.

2.    *Statistical and econometric evidence of manipulation.*

The complaints also contain detailed statistical analyses that corroborate the conspiracy allegation. One striking example is that, historically, LIBOR moved in virtual lockstep with the Federal Reserve Eurodollar Deposit Rate (FRED)—a broader market survey of lending costs to banks for Eurodollar deposits—with LIBOR consistently just above FRED. Bondholders' Compl. JA212-13 ¶¶41-44.

But as Figure 2 below illustrates, the start of the conspiracy in August 2007 marked a striking divergence between LIBOR and FRED, with the spread turning suddenly *negative* and remaining that way for several years (seen in the dip circled below). *Id.* JA 213-18 ¶¶44-48, 52. The spread miraculously returned to normal only around October 2011—immediately after the European Commission raided banks in connection with its LIBOR investigation. *See id.* JA213 ¶44 n.21.



The complaints contain several other corroborative analyses that cannot all be summarized here. *See* Bondholders' Compl. JA210-58 ¶¶36-111. Suffice it to say that careful expert analysis determined that these anomalies strongly indicate collusive suppression of LIBOR. *See, e.g.*, *id.* JA213-29, 254-58 ¶¶44-57, 105-11.

## C. The plaintiffs and their injuries.

The various appellants all hold financial instruments that incorporate LIBOR directly into their price terms. Defendants' collusive suppression of LIBOR thus fixed the prices in appellants' LIBOR-based transactions, depriving them of money by causing them to receive less and/or pay more. Exch. Compl. JA295-96 ¶¶14-15; Bondholders' Compl. JA278-79 ¶¶173-79.[5] This is the most straightforward possible antitrust injury; plaintiffs allege the same injury as any antitrust plaintiff who pays or receives the cartel price, rather than the competitive price, because of price fixing. As with any other cartel victim, plaintiffs' injuries stem directly from the substitution of prices based on collusion for prices based on competition.

## II. Procedural History

As government investigations revealed the malfeasance by panel-member banks, various holders of LIBOR-indexed financial instruments reacted with

---

[5] For example, Bondholders were harmed when they received less interest for the use of their money. *See, e.g.*, *United States v. Heilbroner*, 100 F.2d 379, 381 (2d Cir. 1938) (interest is "the price to be paid for the use of borrowed money"). The Schwab plaintiffs maintain that LIBOR suppression also lead them to receive depressed interest payments on their fixed-rate instruments. *See* Schwab Bank Complaint, SDNY Dkt. #11-2262, Doc. 148, ¶¶193-94. Exchange-Based Plaintiffs, meanwhile, lost money when they traded Eurodollar futures contracts at artificial prices. Exch. Compl. JA384-85 ¶¶206-12. And plaintiffs holding rate swaps were injured, *inter alia*, by receiving suppressed interest-rate payments *and* by paying artificially inflated prices to terminate the swap. *E.g.*, Philadelphia Compl. JA1398 ¶12. For brevity, this brief sometimes refers only to the former type of injury, but should be read to include them all.

lawsuits. More than 60 actions are associated in an MDL before Judge Buchwald, *see Gelboim*, 135 S. Ct. at 901. Many involve Sherman Act Section 1 claims.

Defendants moved to dismiss, devoting just a single paragraph to arguing that plaintiffs failed to plead antitrust injury. *See* Motion to Dismiss, SDNY Dkt. #11-2262, Doc. 166 at 26-27. This tellingly limited treatment failed to assert any disconnect between the plaintiffs' injuries and the competitive harm. Instead, the defendants merely referred back to a previous assertion that allegations of LIBOR manipulation "fail to allege any restraint of trade" at all. *See id.* at 25, 27. Defendants' theory was that *no* plaintiff could show "any competition-reducing aspects of USD LIBOR" insofar as the defendants "plainly do not 'compete' in the setting of USD LIBOR." *Id.* at 22. Put otherwise, defendants' sole argument was that no one could even allege a Sherman Act *violation* because the LIBOR-setting process itself is not competitive, and therefore, manipulating it could not be anticompetitive.

Plaintiffs opposed, explaining that defendants were focused on the wrong question. Plaintiffs were not (and are not) attacking the LIBOR-setting process itself, but rather its anticompetitive *manipulation*, which rendered it a tool for horizontal price fixing rather than a tool for efficient pricing based on competitive conditions. Plaintiffs' allegation was thus that defendants were horizontal competitors not in the "setting of LIBOR," but in the offering of "LIBOR-based

financial instruments," Joint Opposition, SDNY Dkt. #11-2262, Doc. 207 at 29-35—the same Sherman Act theory the Justice Department asserted with respect to defendants' manipulation of Yen LIBOR.

Essentially adopting defendants' argument, the district court granted the motion and dismissed the antitrust claims in all of the actions then pending in the LIBOR MDL. SPA47. The court concluded that plaintiffs did not allege "a competition-*reducing* aspect or effect of the defendant's behavior," SPA27 (quoting *Atl. Richfield Co. v. USA Petroleum Co.* ("*ARCO*"), 495 U.S. 328, 344 (1990)), because "the process of setting LIBOR was never intended to be competitive." SPA31. The court thus viewed plaintiffs as alleging a theory of "misrepresentation," *id.*, or "fraud," SPA34, rather than an antitrust violation.

With regard to the effects of defendants' conduct on LIBOR-based financial instruments, the court recognized that plaintiffs' complaints could "support an allegation of price fixing." SPA32. Nonetheless, it held that "it is not sufficient that plaintiffs paid higher prices because of defendants' collusion; that collusion must have been anticompetitive, involving a failure of defendants to compete where they otherwise would have." SPA33. Elsewhere, the court recognized that defendants *do* compete in the market for LIBOR-based financial instruments, but suggested that competition proceeded "unimpaired" because the banks remained free to set their overall rates "at any level above or below LIBOR." SPA41, 46.

The court did not attempt to reconcile these statements with each other, nor to reconcile its overall demand for "anticompetitive" collusion with antitrust law's best-known rule—namely, that "price fixing" or "collusion" is anticompetitive *per se*.

As further support for its decision, the court noted that it was theoretically possible for defendants to have caused the same harm without entering into a cartel by deciding independently to misrepresent their borrowing costs in the LIBOR-setting process. SPA34-38. The court did not identify any case in which the victims of horizontal price fixing were denied a finding of antitrust injury on this theory or any other, however. Instead, it relied on cases where the defendants' *competitors* complained about conduct that tended to *increase* competition. *See* SPA34-40 (discussing only *Brunswick* and *ARCO*).

## SUMMARY OF ARGUMENT

Appellants allege horizontal price fixing and the quintessential form of antitrust injury therefrom: Paying or receiving a fixed price. The district court's holding that they lack antitrust injury is unprecedented, squarely foreclosed by a well-developed body of law governing antitrust injury, and fundamentally inconsistent with the *per se* rule against horizontal price fixing. The relevant question is whether a plaintiff's alleged injury "flows from that which makes defendants' acts unlawful" under the antitrust laws. *Brunswick*, 429 U.S. at 489.

Injuries caused by paying or receiving a cartel price flow from the very heart of what the Sherman Act condemns. For that reason, the leading treatise describes claims like these as "the easy cases" of antitrust injury. Areeda & Hovenkamp ¶391b.

Despite these well-settled principles, the district court required plaintiffs to make a separate "allegation of harm to competition," SPA39—as opposed to showing how the harm to competition from defendants' price fixing *fell on them*. The core reasoning was that defendants had not harmed competition at all because the tool of their conspiracy was the LIBOR-setting process, which, the court purported to find, is not itself competitive. But this reasoning vitiates the *per se* rule, which recognizes that horizontal price fixing is necessarily anticompetitive no matter the means by which it is accomplished. *See Socony*, 310 U.S. at 223. Requiring plaintiffs to plead a separate "harm to competition" to establish antitrust injury would render that rule a dead letter. *Compare Pace Elecs., Inc. v. Canon Computer Sys.*, 213 F.3d 118, 123-124 (3d Cir. 2000) (so holding) *with* SPA33 (requiring plaintiffs to show that "that collusion [was] anticompetitive").

Even putting that aside, the *manipulation* of LIBOR as a means of fixing prices in LIBOR-based instruments was plainly anticompetitive, whether or not the LIBOR-setting process itself involves competition when it operates *as intended*. The fact that competitors are sometimes allowed to engage in associated activities

(as defendants were when they followed their BBA rules) obviously does not allow them *carte blanche* to misuse those processes for manifestly anticompetitive ends. The district court's contrary conclusions will harm civil and criminal antitrust enforcement alike. Its judgment should be reversed.

## STANDARD OF REVIEW

This Court reviews the grant of a Rule 12(b)(6) motion to dismiss *de novo*, "accept[ing] as true the factual allegations of the complaint, and constru[ing] all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185-86 (2d Cir. 2012).

Denial of a motion to amend a pleading is reviewed for abuse of discretion, but review is *de novo* where (as here) the appellant argues that the district court applied an erroneous legal standard and/or that the proposed amendment was not futile. *Id.* at 185-86.

## ARGUMENT

### I. The District Court Erred In Holding That Plaintiffs Failed To Allege Antitrust Injury

#### A. Plaintiffs allege the prototypical form of antitrust injury.

Evaluating allegations of antitrust injury involves "a three-step process." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013). The plaintiff identifies (1) "the practice complained of and the reasons such a practice

is or might be anticompetitive," as well as (2) "the actual injury" suffered, and then (3) the court compares them to ensure that the plaintiff's injury is "of the type the antitrust laws were intended to prevent and … flows from that which makes or might make defendants' acts unlawful." *Id.* Simply put, the court must ensure that the plaintiff's injuries arise from the allegedly anticompetitive effects of defendants' conduct, and not merely from a practice that happens to violate the antitrust laws for reasons unrelated to the plaintiff's harms. *Brunswick*, 429 U.S. at 489.

For example, horizontal price fixing plainly causes antitrust injury to a cartel's customers, but actually benefits its "fringe" competitors (and causes antitrust injury to *their* customers as well), because the fringe competitors can also charge the cartel's artificially increased price without risk of losing out to lower-priced competition. *See US Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 627 (7th Cir. 2003) (Easterbrook, J.) (explaining this effect). Accordingly, all the *customers* have antitrust injury, but the *competitors* do not—even if they were injured in some other way by the enrichment of the cartel. *Id.*; *see also Brunswick*, 429 U.S. at 489; *ARCO*, 495 U.S. at 338 (both identifying circumstances where *competitors* lack antitrust injury).

Here, the plaintiffs allege the strongest possible claim of antitrust injury with respect to all three steps. First, they allege "the archetypal example" of a "plainly

anticompetitive" practice: Horizontal price fixing. *Catalano*, 446 U.S. at 647.

Second, they allege the archetypal form of injury: A loss of money. And third,

they allege the strongest possible connection between the two—namely, that they

lost money as a result of defendants' price fixing because they received the fixed

price. *See, e.g.*, *DDAVP*, 585 F.3d at 688 (where "plaintiffs are purchasers of the

defendants' product who allege being forced to pay supra-competitive prices as a

result of the defendants' anticompetitive conduct[,] [s]uch an injury plainly is 'of

the type the antitrust laws were intended to prevent'") (quoting *Brunswick*, 429

U.S. at 489); *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 987-88 (9th

Cir. 2000) (when "horizontal price fixing causes buyers to pay more, or sellers to

receive less, than the prices that would prevail in a market free of the unlawful

trade restraint, antitrust injury occurs"); *In re Foreign Exch. Benchmark Rates*

*Antitrust Litig.* (*FOREX*), 2015 WL 363894, *12 (S.D.N.Y. Jan. 28, 2015)

("[H]aving to pay supra-competitive prices as a result of a horizontal price-fixing

conspiracy is the quintessential antitrust injury.").

These points alone are sufficient to reverse. We briefly review them below

before responding to the serious analytic errors that explain the district court's

anomalous holding.

*1.        Price fixing is the paradigmatic antitrust violation.*

Horizontal price fixing is "perhaps the paradigm of an unreasonable restraint of trade." *NCAA v. Bd. of Regents of Uni. of Okla.*, 468 U.S. 85, 100 (1984).  Price competition is "the free market's means of allocating resources," *Broad. Music, Inc. v. Columbia Broad. Sys.*, Inc., 441 U.S. 1, 23 (1979), whereas an agreement to fix prices "'deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands,'" *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769 (1984).  Antitrust law thus takes the hardest line possible against collusive price manipulation, deeming it *per se* anticompetitive and illegal whether the effect is that prices are "raised, lowered, or stabilized." *Socony*, 310 U.S. at 221.

"[A] complaint that sufficiently pleads a per se violation need not separately plead harm to competition," because a conclusive inference of that harm arises from the price-fixing allegation itself.  *FOREX*, 2015 WL 363894, *8; *see Digital Distrib. Inc. v. CEMA Distrib.*, 1997 U.S. App. LEXIS 16815, at *4 (9th Cir. July 3, 1997) ("Digital was not required to allege harm to competition specifically; horizontal price-fixing is per se harmful to competition.").  "Price-fixing agreements are 'conclusively presumed to be unreasonable and therefore illegal' precisely because of their 'pernicious effect on competition' and lack of any redeeming virtue." *Publ'n Paper*, 690 F.3d at 67.  The Third Circuit has thus

carefully explained that, although plaintiffs must show antitrust injury by demonstrating how the (conclusively presumed) anticompetitive harms from a *per se* violation fall upon *them*, they have no obligation to separately allege a harm to competition, because that would mean "removing the presumption of anticompetitive effect implicit in the *per se* standard under the guise of the antitrust injury requirement." *Pace*, 213 F.3d at 123-24.

In fact, *this* Court presumes a harm to competition for purposes of evaluating antitrust-injury allegations even in non-*per se* cases. To avoid confusing the antitrust merits with the antitrust-injury inquiry, this Court will "assume that the practice at issue is a violation of the antitrust laws," and "posit[] a rationale" for its prohibition even if the practice might survive scrutiny on the merits under the Rule of Reason. *Gatt*, 711 F.3d at 76 n.9; *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 437 (2d Cir. 2005). That this case involves horizontal price fixing only makes the inquiry radically simpler. One need not "posit[] a rationale" for why price fixing might be anticompetitive because, under the *per se* rule, the Supreme Court already conclusively presumes that it harms competition by harming the independent, competitive price structures on which the free market depends. *See Socony*, 310 U.S. at 224 & n.59 (horizontal price fixing is *per se* anticompetitive because prices are "the central nervous system of the economy," and any

agreement to fix prices thus deprives the economy of the primary benefit of competition).

Moreover, the fact that defendants fixed just a "component" of the price (LIBOR) makes no difference. The *per se* rule does not distinguish between fixing "prices" and fixing price "components" or formulae. *See Catalano,* 446 U.S. at 648. In fact, every relevant authority agrees that "[t]he per se rule generally governs not only explicit price fixing but also agreements to fix a 'price element.'" Areeda & Hovenkamp ¶2022a.[6] Accordingly, in pursuing defendants RBS and Deutsche Bank, the Justice Department took the view that collusively manipulating Yen LIBOR as a means of fixing the price of LIBOR-based financial instruments was horizontal price fixing because LIBOR was "a key component" of the price in those instruments. *See supra* pp.13-14 & n.4.

Likewise, it does not matter whether the tool for collusively manipulating prices is agreeing to abuse a benchmark-setting process like LIBOR or holding a meeting in a proverbial smoke-filled room. The Supreme Court has made clear— and emphatically reiterated—that the "the machinery employed by a combination

---

[6]    *See also Knevelbaard*, 232 F.3d at 990; *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960); *In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 362-63 (3d Cir. 2004); *In re Yarn Processing Patent Validity Litig*., 541 F.2d 1127, 1136-37 (5th Cir. 1976); *In re Rail Freight Fuel Surcharge Antitrust Litig*., 587 F. Supp. 2d 27 (D.D.C. 2008); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc*., 253 F. Supp. 2d 262 (D. Conn. 2003).

for price-fixing is immaterial." *Socony*, 310 U.S. at 223; *Catalano*, 446 U.S. at 647. All such agreements are conclusively presumed to injure competition if the "purpose and effect" of the defendants' combination is to fix prices. *Socony*, 310 U.S. at 224 (emphasis added).[7]

The bottom line is that "any combination which tampers with price structures is engaged in unlawful activity," because its members, "to the extent that they raised, lowered, or stabilized prices[,] … would be directly interfering with the free play of market forces." *Id*. at 221. And as even the district court recognized, LIBOR is pivotal to the price structure of *LIBOR-based* financial-instrument markets precisely because the price formulae used in those markets expressly incorporate this benchmark. SPA8, 16-18, 20, 23, 39, 46. Defendants' collusion to manipulate LIBOR thus worked the exact kind of interference with competitive pricing that the *per se* rule condemns as necessarily anticompetitive.

The facts of *Socony* are instructive. The object of the conspiracy there was to raise and maintain gasoline prices for wholesalers (called "jobbers") and retail consumers. *See, e.g.*, 310 U.S. at 169, 199-91, 253. The "machinery employed,"

---

[7]     *Socony* was a criminal case with a concomitant *mens rea* requirement, which accounts for the need to show anticompetitive "purpose." In a civil antitrust case like this, the Section 1 "violation can be established by proof of either an unlawful purpose *or* an anticompetitive effect." *United States v. United States Gypsum Co.*, 438 U.S. 422, 436 n.13 (1978) (emphasis added).

however, was not a direct agreement on the prices in those transactions, but instead an agreement to manipulate the published price for tank cars of gasoline in the "spot market." This worked because "the vast majority of jobbers' supply contracts during that period contained price formulae which were directly dependent on the … spot market prices," *id.* at 198, while retail prices were also determined by different adjustments to the same benchmark. *See id.* at 192. Plaintiffs assert the exact same theory of anticompetitive purpose and effect here— namely, that defendants agreed to collusively manipulate a published benchmark and caused anticompetitive harm to the plaintiffs because all of their "contracts … contained price formulae which were directly dependent on [LIBOR]." *Id.* at 198. *Socony* thus makes clear that such an agreement is covered by the *per se* rule.

The core of the district court's reasoning violated these settled precedents. Although nominally a holding about "antitrust injury," both the defendants' briefing and the district court's analysis turned on whether defendants' horizontal price fixing was anticompetitive. Recall that defendants' only substantive argument about antitrust injury *was a cross-reference* to the argument that collusively manipulating LIBOR was not a Sherman Act violation at all. *See supra* p.20. This analysis represents a dramatic break with settled law. For purposes of the antitrust-injury inquiry, the question whether defendants' behavior was generally anticompetitive is necessarily resolved against them by this Court's rule

from *Daniel* and *Gatt* and—most critically—by the longstanding and conclusive presumption of the *per se* rule.  *See Publ'n Paper*, 690 F.3d at 67; *Pace*, 213 F.3d at 123-24.

### 2.    *Plaintiffs received fixed prices.*

Each appellant alleges the same fundamental form of injury:  Each holds a financial instrument with payments tied to or calculated in terms of LIBOR; defendants conspired to suppress LIBOR; and plaintiffs thus allege that they received a price affected by price fixing in the literal sense that they got the cartel's LIBOR price.  *See supra* p.19.  Even the district court recognized plaintiffs' allegation that, because "the prices of LIBOR-based financial instruments were affected by Defendants' unlawful behavior[,] … Plaintiffs paid more or received less than they would have in a market free from Defendants' collusion."  SPA32 (quotation marks omitted).  The existence of this prototypical form of injury is therefore not in dispute.

### 3.    *Receiving fixed prices is the quintessential antitrust injury.*

Because appellants allege that defendants engaged in prototypical price fixing, and that they received the cartel price, the last step for determining the existence of antitrust injury is straightforward.  If horizontal price fixing is the "the paradigm of an unreasonable restraint of trade," *NCAA*, 468 U.S. at 100, receiving

or paying horizontally fixed prices is the paradigmatic antitrust injury. As the

Supreme Court matter-of-factly observed in *Reiter v. Sonotone Corporation*:

> The essence of the antitrust laws is to ensure fair price competition in an open market. Here, where petitioner alleges a wrongful deprivation of her money because the price of the hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct, *she has alleged an injury in her "property" under [Clayton Act] §4.*

442 U.S. 330, 342 (1979) (emphasis added). This Court's precedents are equally

plain. *See Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91,

107 n.12 (2d Cir. 2007) (question whether plaintiff that pays prices inflated by

horizontal price fixing suffers antitrust injury is "readily resolved" in the

affirmative); *DDAVP*, 585 F.3d at 688 (purchasers who pay cartel prices "plainly"

suffer antitrust injury); *Todd*, 275 F.3d at 213-14 (allegation that plaintiffs received

suppressed compensation because of information-sharing conspiracy held

sufficient to allege antitrust injury). The other Circuits are in accord. *See, e.g.*,

*Knevelbaard*, 232 F.3d at 987-88 (plaintiff milk suppliers suffered antitrust injury

from buyer cartel's collusive price suppression); *US Gypsum*, 350 F.3d at 627-28

(buyers who pay higher price because of cartelization suffer antitrust injury); *Loeb*

*Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481-85 (7th Cir. 2002) (Wood,

J.) (similar).

Indeed, a different judge of the Southern District (Schofield, J.) reached

exactly this result with respect to the legally indistinguishable allegations in the

*FOREX* case—expressly rejecting the reasoning below.  There, the plaintiffs

alleged that the defendants manipulated a benchmark price in the foreign exchange

currency market known as "the Fix," just as the plaintiffs here allege that

defendants manipulated the LIBOR benchmark.  The plaintiffs there held FOREX

spot-market contracts "priced at or by the Fix," just as the plaintiffs here held

instruments with prices set at or by LIBOR.  The *FOREX* court easily concluded

that the plaintiffs alleged antitrust injury because "a consumer's injury of having to

pay supra-competitive prices as a result of a horizontal price-fixing conspiracy is

the quintessential antitrust injury." *FOREX*, 2015 WL 363894, *12.  The same

result necessarily follows here.[8]

Judge Schofield's decision is correct and consistent with voluminous

precedent; the opposite decision below is not.  As the leading treatise explains,

"[c]ollusion on price—whether by sellers or by buyers—imposes a readily

identifiable efficiency loss and corresponding antitrust injury."  Areeda &

---

[8]      Judge Schofield noted that the means of accomplishing the price
fixing in *FOREX* was collusive market transactions rather than, as in this case,
collusive submissions in a benchmark-setting process, *see* 2015 WL 363894, at
*11, but did not suggest that this distinction was dispositive—or even significant.
In fact, this distinction regarding the *means* of accomplishing the conspiracy is
"immaterial" under *Socony*, *supra* pp.29-30, and it cannot affect the antitrust-injury
analysis because it does not change either the anticompetitive effects of
defendants' conduct or the harm suffered by the plaintiffs.  *See infra* pp.51-52.

Hovenkamp, ¶391b. "These are the easy cases, because what makes the practice illegal is the cause of just about any conceivable injury." *Id.*[9]

Notably, the district court's opinion would not only reject these "easy cases" of antitrust injury in the civil context, but significantly hamper criminal prosecutions as well. Both private plaintiffs and government prosecutors must show that the alleged misconduct is anticompetitive. Areeda & Hovenkamp ¶335f (cautioning against confusing antitrust injury with the merits, and noting that the "absence of any threat to competition means that no violation has occurred" and the government will have no case). Thus, the district court's theory that horizontal price fixing by means of manipulating LIBOR is not anticompetitive, and therefore no plaintiff has antitrust injury, is fatal to government actions no less than private ones—including the DOJ's deferred prosecutions of defendants RBS and Deutsche Bank, among other present and future cases. Likewise, the district court's rejection of the *per se* rule for these "allegations of price fixing" would allow *admitted* cartelists in future cases to argue that their "collusion" might not "have been anticompetitive" as a defense to both damages suits *and* criminal prosecutions.

---

[9] That said, other district courts have begun to rely upon the mistaken reasoning below. *See Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, *7-9 (S.D.N.Y. Mar. 28, 2014); *7 West 57th St. Realty Co., LLC v. Citigroup, Inc.*, 2015 WL 1514539, *14-20 (S.D.N.Y. Mar. 31, 2015).

The district court's opinion does not resolve this critical problem. At the very end, it "recognize[s] that it might be unexpected that we are dismissing a substantial portion of plaintiffs' claims, given that several of the defendants have already paid penalties to government regulatory agencies reaching into the billions of dollars." SPA159. The court attributed these differences to the fact that "there are many requirements that private plaintiffs must satisfy, but which government agencies need not." SPA160. To be sure, antitrust injury is one of those requirements. But neither the government nor a private plaintiff can pursue an antitrust claim without alleging *anticompetitive* conduct. The holding below that horizontal price fixing is not necessarily anticompetitive, and does not necessarily injure those who receive the fixed prices, is thus a fundamental danger not only to antitrust plaintiffs, but antitrust enforcement as a whole.

## B. The district court's contrary conclusion rests on fundamental legal errors.

Apart from its misapplication of the *per se* rule and this Court's settled approach to allegations of antitrust injury, the opinion below endorses several analytical errors that are contrary to fundamental premises of antitrust law. While the foregoing points are sufficient to reverse, these errors explain the court's erroneous holding and themselves represent dangerous turns in antitrust precedent that this Court should reject.

*1.  The district court misapplied* Brunswick *and* ARCO*, which in fact support plaintiffs' claim of antitrust injury.*

As Judge Schofield explained in *FOREX*, the decision below is "unpersuasive for the additional reason that it relies on two inapposite Supreme Court cases—*Brunswick* and *ARCO*." *FOREX*, 2015 WL 363894, at \*12.  Those two cases—which are the only antitrust-injury authorities the district court invoked to affirmatively support its holding—rejected assertions of antitrust injury where defendants' *competitors* complained about *increased* competition.  In this case and *FOREX*, by contrast, plaintiffs stand *across* the market from the defendants and complain about defendants' classic *restraint* of competition.  To the extent defendants' conspiracy deprived plaintiffs and the economy of a primary benefit of competition—a competitively set price—plaintiffs were clearly harmed.  Thus, as Judge Schofield emphasized, neither *Brunswick* nor *ARCO* is applicable here precisely because (among many other distinctions) neither case involved an allegation of horizontal price fixing.  *See id*.

The facts of *Brunswick* and *ARCO* demonstrate the errors in the district court's analysis and show the need for an antitrust-injury finding here.  In *Brunswick*, the defendant bowling company acquired some failing competitors. Other bowling alleys sued, arguing that this was an illegal merger under Clayton Act §7.  *Brunswick*, 429 U.S. at 480.  Plaintiffs' theory of injury was that if the illegal acquisitions had not occurred, the acquired bowling alleys would have gone

out of business, causing plaintiffs to profit from fewer competing facilities. *See id.* at 481. The Supreme Court held that such plaintiffs do not present a legally cognizable theory of injury because they allege that they were harmed *by competition*, and seek a rule that favors its absence. *See id.* at 490. The Court explained that the antitrust laws "are not merely indifferent" to that claim of injury, but fundamentally opposed to it. *Id.* at 486-488. The bowling market and its consumers *benefitted* from the merger, and the antitrust laws were enacted for the protection of "competition not competitors." *Id.* at 488.

Similarly, the plaintiff in *ARCO* was an independent gasoline retailer that sued ARCO for vertical maximum price fixing, which (at the time) was a *per se* violation of Section 1. The plaintiff alleged that ARCO conspired with its retailers to keep prices *too low*, which would drive independent retailers out of business. In other words, the *ARCO* plaintiff was a competitor complaining about excessively sharp competition and, just as in *Brunswick*, was objecting to a practice that was apparently beneficial to the competitiveness of the retail gas market and its consumers. *ARCO*, 495 U.S. at 331-33. The Court recognized that honoring that claim of injury would potentially harm consumers by punishing companies for cutting prices, which is *exactly* what competition hopes to achieve. *Id.* at 337-38.

These holdings could hardly have less to do with the present case; if anything, they favor plaintiffs' claims here. Plaintiffs complain as parties injured

by getting the fixed price and suppressed payments, not as defendants'
competitors. Indeed, there is no market or set of consumers that benefited through
an increase in or preservation of competition from defendants' conspiracy to
manipulate LIBOR. The only effect of defendants' conduct was to transform
LIBOR from an efficient pricing mechanism tied to competition into a tool of price
fixing created by collusion. Plaintiffs here thus have far more in common with the
*consumers* the Court sought to protect in *ARCO* than with the plaintiff *competitors*
in that case.

In fact, the district court's misreading of *ARCO*'s holding is central to its
legal error. Focusing narrowly on *ARCO*'s statement that an antitrust plaintiff's
injury must "stem[] from a competition-*reducing* aspect or effect of the
defendant's behavior," 495 U.S. at 344, the district court concluded that a private
plaintiff alleging horizontal price fixing cannot rely on the *per se* rule's conclusive
presumption of harm to competition, but instead must plead and prove that
defendants' conduct was actually "competition-reducing." That, however, takes
the words of *ARCO* entirely out of context.

The *ARCO* Court explained that the purpose of the antitrust-injury
requirement is to "ensure[] that the harm claimed by the plaintiff corresponds to
the rationale for finding a violation of the antitrust laws in the first place," and thus
to "prevent[] losses that stem from competition from supporting suits by private

plaintiffs for either damages or equitable relief." *Id*. at 342. The requirement is *not* intended to determine "whether a restraint is 'unreasonable,' *i.e.,* whether its anticompetitive effects outweigh its procompetitive effects." *Id.* That distinct inquiry is resolved either by the Rule of Reason or, in cases like this one, by the *per se* rule. *See, e.g.*, *id.*; *Pace*, 213 F.3d at 123-23; *supra* pp.27-28.

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), is instructive. As here, *McCready* did not involve a competitor plaintiff, and the Court upheld the plaintiff's claim of antitrust injury. McCready alleged that Blue Cross conspired with psychiatrists to exclude psychologists from coverage, and that she suffered antitrust injury when Blue Shield refused to reimburse her psychologist's treatments. *Id.* at 468-69. She did not allege a "restraint in the market for group health plans," *id.* at 480, nor did she allege, as Justice Rehnquist noted in dissent, "that her injury was caused by *any reduction in competition* between psychologists and psychiatrists." *Id.* at 489 (emphasis added). Yet the Supreme Court held that her complaint satisfied the requirements for pleading antitrust injury, taking care to note that a civil antitrust plaintiff need not "prove an actual lessening of competition in order to recover," *id.* at 482 (quotation marks omitted), at least where they allege "a purposefully anticompetitive scheme." *Id.* at 483.

Indeed, as then-judge Kennedy would later observe, "McCready was … *like* an ordinary consumer who complains about price-fixing in a particular market."

*Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739, 749 (9th Cir. 1984) (emphasis added) (Kennedy, J., dissenting).  Here plaintiffs *actually are* consumers (or suppliers) harmed by price-fixing in particular markets—the paradigmatic injury from the archetypal anticompetitive practice.  They are not at all like the competitor plaintiffs in *Brunswick* and *ARCO* griping about more competition; instead, they are like the consumers in *Brunswick*, *ARCO*, and *McCready* whom the Court was determined to protect.

In the end, this Court can avoid a disagreement with the Third Circuit and settled Supreme Court doctrine by simply adhering to its own consistent precedent, which treats this as a straightforward case of antitrust injury.  *See, e.g.*, *DDAVP*, 585 F.3d at 688; *Todd*, 275 F.3d at 213-14; *Cordes*, 502 F.3d at 107 n.12.  By contrast, affirming the district court's rationale will make this Court an outlier and substantially undermine its own settled rules.

       2.     *The cooperative aspects of the LIBOR-setting process do not invalidate claims of anticompetitive harm—they make them more likely.*

In addition to misapplying *Brunswick* and *ARCO*, the district court fundamentally erred in holding that plaintiffs did not rest their claims on an

"anticompetitive aspect of defendants' conduct" based on its own finding that the LIBOR-setting process itself is not competitive.[10]

As an initial matter, this is irrelevant:  Price fixing is price fixing.  The law regards it as inherently anticompetitive through whatever vehicle it may be achieved—including a trade association conducting cooperative activities.  *See, e.g.*, *Nat'l Soc. of Prof. Eng'rs v. United States*, 435 U.S. 679, 692-696 (1978). That the *unmanipulated* LIBOR-setting process can be used for legitimate, cooperative purposes does not excuse its collusive *manipulation* for anticompetitive purposes from scrutiny under the antitrust laws.  *See* Sharon E. Foster, *Harm to Competition and the Competitive Process: A Circular Charade in the LIBOR Antitrust Litigation*, 10 B.Y.U. INT'L L. & MGMT. REV. 91 (2015) (severely criticizing the *LIBOR* decision for creating "a new requirement that only those activities that are a product of a competitive process can harm competition").

To the extent that LIBOR-setting's "cooperative" nature is relevant, however, the district court got that relevance backwards.  In practice, any instance of cooperation among horizontal competitors *raises* the risks of anticompetitive

---

[10] As the complaints make clear, the LIBOR-setting process is "cooperative" or "non-competitive" only in the narrowest possible sense.  In fact, its design requires *independence* and strictly prohibits any coordination beyond sending submissions to the BBA.  Defendants' conspiracy to suppress their submissions in concert thus substantially increased the scope of their (now illegal) collaboration.  *Infra* p.47.

harms—even when, because the arrangement is not surreptitious price fixing (as it is here), the law is receptive to the possibility of legitimate justifications. *See generally* Antitrust Guidelines for Collaborations Among Competitors ("Collaboration Guidelines") (FTC/DOJ, April 2000), https://goo.gl/YchJg1. The law and the antitrust enforcement agencies permit cooperative relationships among competitors only when they are structured to avoid even enabling price fixing. *See, e.g.*, *id.*; *Am. Column & Lumber*, 257 U.S. at 410-11; *Maple Flooring*, 268 U.S. at 563.

Put otherwise, the fact that the law sometimes allows competitors to collaborate is not a blank check to misuse those processes for anticompetitive ends. As the Supreme Court has put it: "Private standard-setting by associations comprising firms with horizontal and vertical business relations is permitted *at all* under the antitrust laws *only* on the understanding that it will be conducted in a nonpartisan manner offering procompetitive benefits." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 506-09 (1988) (emphasis added). That "hope of procompetitive benefits depends upon the existence of safeguards sufficient to prevent the standard-setting process from being biased by members with economic interests in restraining competition." *Id.* at 509. And that is exactly what makes *manipulating* such processes by violating their rules for the purpose of fixing prices a paradigmatic antitrust violation.

Any instances of cooperation among competitors thus call for greater vigilance precisely because they create the means and opportunity for competitors to act on the ever-present motive to fix prices and raise profits at consumers' or suppliers' expense.  As two highly respected authorities have explained, greater vigilance against anticompetitive price fixing is required in contexts where competitors are already cooperating—like trade associations—because those activities "provide[] the structure for cartel decision making, the cover for why competitors are gathering, and may also foster a social climate conducive to collusion."  Herbert Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager*, 64 VAND. L. REV. 813, 837-39 (2011).  In fact, antitrust law has long recognized that trade-association activities, like the BBA's LIBOR-setting process, "can be rife with opportunities for anticompetitive activity," *see Am. Soc. Of Mech. Eng'rs, Inc. v.  Hydrolevel Corp.*, 456 U.S. 556, 571 (1982), *even when their safeguards are followed*.[11]  Where, as here, those safeguards are circumvented in order to accomplish an anticompetitive end, antitrust law condemns the conduct as such.  *See Allied Tube*, 486 U.S. at 497-98, 509.

---

[11]     Numerous Supreme Court cases have condemned horizontal price fixing achieved through cooperative trade-association activities.  *See e.g., Ariz. v. Maricopa County Medical Soc.,* 457 U.S. 332, 335-336, 348-357 (1982); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 781-83 (1975); *United States v. Nat. Ass'n of Real Estate Bds.*, 339 U.S. 485, 488-89 (1950); *FTC v. Pacific States Paper Trade Assoc.*, 273 U.S. 52, 58-61 (1927).

The facts of *Allied Tube* itself are instructive. The Supreme Court there affirmed the judgment of this Court, which held that the collusive subversion of a trade association's standard-setting process to achieve an anticompetitive effect violated Section 1 and caused antitrust injury. The *Allied Tube* plaintiffs did not claim that the cooperative standard-setting process *itself* involved any competition (as the district court required here, *see* SPA39), nor did they allege that the process had anticompetitive effects when functioning as intended. Instead, they claimed that the defendants had *manipulated* the standard-setting process to achieve an anticompetitive effect in the market that *used* those standards. *See Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938, 946-47 (2d Cir. 1987). The claim here is the same—namely, that the defendants conspired to *manipulate* the LIBOR-setting process to suppress the competitive price in the financial markets that *use* LIBOR as the pivotal pricing mechanism.

Indeed, defendants' manipulation of the LIBOR-setting process fits quite squarely within these precedents, and to the extent that it is different, that is only because it is *much* more obviously anticompetitive. Prior to defendants' collusive manipulation, the LIBOR-setting process was, in essence, a trade association standard-setting activity. It involved a combination of horizontal competitors (defendants) executing an agreed process pursuant to agreed rules to achieve an agreed objective: The daily publication of a moving interest-rate benchmark

45

reflecting the competitive forces of supply and demand in short-term lending markets, intended for direct use in contractual pricing formulae. It was "permitted at all under the antitrust laws only on the understanding that it w[ould] be conducted" under the BBA rules—rules that made the benchmark reflect competition in the interbank lending markets, rather than collusion among the competitor banks. *See Allied Tube*, 486 U.S. at 506-09.

Decades later, after the LIBOR pricing mechanism was widely accepted by the financial markets, defendants agreed to hijack it in order to suppress prices in LIBOR-based transactions. They cast aside the BBA's protective rules and continued their agreed participation in the agreed LIBOR-setting process without them. Instead of independent submissions, they made coordinated, suppressed submissions, producing a collusively suppressed pricing benchmark still equally incorporated into a wide swath of financial contracts. The hijacked process had *now* become necessarily and unequivocally anticompetitive, both in conduct (because there were no more "independent centers of decisionmaking," *Copperweld*, 467 U.S. at 769) and effect (because prices had become suppressed below competitive levels).

The only difference between LIBOR and these cases is that, unlike with standard-setting and other more complicated situations, the LIBOR-setting process operates *directly* on price. That means that collusive manipulation of LIBOR falls

right within the heart of the *per se* rule against horizontal price fixing. What these cases clarify is simply that hijacking a cooperative process to achieve that kind of anticompetitive aim plainly does violate the antitrust laws, and that such processes can, in fact, be ready-made tools for misbehavior.

Separately, the district court erred in concluding that, because the LIBOR-setting process may involve *some* cooperation, it involves no competitive aspects that could be "reduced." At this stage, the allegations in the complaints must be taken as true, and all inferences must be drawn in favor of the non-moving party. *Anderson News*, 680 F.3d at 185 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). The complaints in this case make clear that, whatever cooperative aspects LIBOR-setting might have, the process was (and was always intended to be) entirely independent until defendants secretly conspired to manipulate it in concert. *See, e.g.*, *supra* pp.8-10. Crediting the complaints, and drawing all inferences in favor of the plaintiffs, it is impossible to conclude at this stage that moving from an independent process to a secretly and collusively manipulated one did not involve *any* reduction in competition, even if that factual allegation were actually required.

> 3. *Defendants' agreement to manipulate LIBOR was manifestly anticompetitive, not merely fraudulent.*

Even leaving aside the *per se* rule *and* the proper application of Sherman Act Section 1 in the context of trade associations and other cooperative endeavors, the

district court plainly erred in holding that there was no anticompetitive effect in this case. By focusing on the fact that the LIBOR-setting process is partially cooperative, the district court ignored the anticompetitive effects that resulted only *after* defendants further conspired to manipulate the process. The question is not whether defendants somehow competed over LIBOR—or through the LIBOR-setting process—before they agreed to manipulate it, but whether the agreement to manipulate LIBOR changed the competitive effects of the entire LIBOR-setting combination so as to erase its justification and make it anticompetitive. *See* Collaboration Guidelines at 7 ("The competitive effects of a relevant agreement may change over time, depending on changes in circumstances such as … adoption of new agreements…. *The Agencies assess the competitive effects of a relevant agreement as of the time of possible harm to competition*, whether at formation of the collaboration or at a later time, as appropriate." (Emphasis added)).

As explained above, the question whether horizontal price fixing has anticompetitive effects is answered completely by the *per se* rule, making it unnecessary to ask this question. *See supra* pp.27-32. But the answer is also obvious. After defendants agreed to violate the BBA rules and thus to collusively manipulate LIBOR, the price that plaintiffs got in transactions governed by their LIBOR-indexed instruments reflected not competition, but whatever defendants' cartel wanted the LIBOR level to be. That is the precise anticompetitive effect that

the antitrust laws are designed to avoid.  *Socony*, 310 U.S. at 221-23; *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 1378946, *14 (S.D.N.Y. Mar. 26, 2015) (allegations that conspiracy based on manipulation of benchmarked price component "substituted supply and demand based-pricing with pricing driven by the … conspiracy … are sufficient to support antitrust injury").

The key point is that competitor collaborations like the LIBOR-setting process are only defensible insofar as they actually serve legitimate purposes, and, conversely, are not used to achieve unnecessary anticompetitive ends.  *See Allied Tube*, 486 U.S. at 506-509; *supra* pp.42-44.  Here, the only justification for the LIBOR-setting process is the creation of a moving daily rate reflecting *competition* in the interbank lending market, which allows that benchmark to be used as a competitive price term in the various LIBOR-based instruments.  Collusion to manipulate the index price necessarily erases that justification, leaving only a naked price-fixing agreement—as even the district court seemed to recognize:

> It is true that LIBOR is a proxy for the interbank lending market; indeed, it is precisely because LIBOR was thought to accurately represent prevailing interest rates in that market that it was so widely utilized as a benchmark in financial instruments. It is also true that if LIBOR was set at an artificial level, it no longer reflected competition in the market for interbank loans and its value as a proxy for that competition was diminished, even "snuffed out."

SPA41.  But the district court missed the necessary legal import of that recognition:  When the arguable justification for competitors working together is

"snuffed out" by their agreement to set prices collusively, nothing remains to justify the "combination," 15 U.S.C. §1, and *per se* condemnation is required.  *See, e.g.*, *Starr*, 592 F.3d at 326-27 & n.5 (*per se* rule may apply to price fixing, even in full-blown joint ventures, if unnecessary to secure supposed pro-competitive benefits); *Major League Baseball Properties v. Salvino*, 542 F.3d 290, 338 (Sotomayor, J., concurring in judgment) (under ancillary restraint analysis, *per se* illegality may be found where naked restraint is not reasonably necessary to achieve procompetitive benefit).  At that point, a claim of harm by paying the manipulated price becomes a quintessential claim of antitrust injury.

Once the right lens is chosen, the anticompetitive effects become plain.  The only justification for having the LIBOR process at all is that it allows contracts to be priced, and payments to be calculated, based on competition in the interbank lending market.  Accordingly, LIBOR is incorporated into plaintiffs' contracts because it reflects (or is meant to reflect) *competitive* conditions, just as spot market prices were incorporated into jobbers' contracts in *Socony* because those were thought to reflect competitive conditions.  *See* 310 U.S. at 169-70.  But once the defendants conspired to manipulate the benchmark price, the LIBOR process became nothing but a tool for fixing prices.  Plaintiffs got less in their LIBOR-indexed financial transactions not because of competition, but because defendants

wanted them to, and agreed to make it so.  Nothing can be more anticompetitive than that.

The Ninth Circuit's decision in *Knevelbaard* is particularly relevant on this point.  Just as here, the defendants there did not "compete over" (*see* SPA42) the setting of California's minimum liquid milk price—the target of their collusive conduct.  Instead, those prices were set through a non-competitive governmental process designed to create a price floor.  *See Knevelbaard*, 232 F.3d at 982, 984-85.  The Ninth Circuit nonetheless held that defendants harmed competition and caused antitrust injury when they *manipulated* that process in concert and caused it to incorrectly reflect competitive conditions in the cheese market (which the milk-pricing system used as an input).  *See id.* at 990.  At that point, the system as a whole stopped fulfilling its intended purpose and operated as just another means of collusively fixing prices, bringing it within *Socony*'s rule that price fixing by any means is illegal *per se*.  *See id*.

That same rule also eviscerates the only arguable reason to distinguish this case from the contemporaneous opposite decision in *FOREX*.  As Judge Schofield noted in *FOREX*, the means of accomplishing the benchmark manipulation there was collusive market transactions rather than collusive misrepresentations in the benchmark-setting process, *see* 2015 WL 363894, at *11—a fact that the district court in this case emphasized in attempting to distinguish *Knevelbaard*.  *See*

SPA32 n.9; SPA47.  But, again, the *means* by which a price-fixing effect is achieved are irrelevant.  Indeed, if the defendants had manipulated LIBOR by collusively agreeing to actually lend each other money at suppressed rates in the interbank loan market, the anticompetitive effect of their price-fixing conspiracy on the price components of plaintiff's LIBOR-indexed instruments (and thus plaintiffs' antitrust injury) would have remained *exactly* the same.  And that purpose and effect—not the price-fixing mechanism—are all that matter.

*Knevelbaard* thus holds that using manipulative *transactions* in one market (cheese) to fix prices in another (milk) is *sufficient* to harm competition, not *necessary*.  *See* 232 F.3d at 990.  The district court's distinction of *Knevelbaard* does not even attempt to show otherwise.  And, in fact, it could not do so because the Ninth Circuit expressly said the opposite.  In finding that the agreement to engage in manipulative transactions in the cheese market caused antitrust injury in the milk market, the Ninth Circuit analogized to a case like this one—which it treated as even more obvious.  In the court's words:  "The result for purposes of antitrust injury analysis *should be no different than if the cheese makers had conspired to report a fictitious NCE price* in order to depress the milk price, which clearly would cause direct injury to the milk producers."  *Id.* (emphasis added) (citing, *inter alia*, *City of Long Beach v. Standard Oil,* 872 F.2d 1401, 1408 (9th

Cir. 1989) (Section 1 price-fixing violation by collusive misrepresentation)). That is a description of this case.

The Fifth Circuit's decision in *Woods Exploration & Producing Co. v. ALCOA*, 438 F.2d 1286 (5th Cir. 1971), is also directly on point. There, production limits on natural gas wells were set not through competition but through a governmental process. *See id.* at 1292. And, again, the defendants collusively agreed to manipulate that process as a means of collusively manipulating the ultimate production limit. *See id.* at 1293. Notably, they did that not through any manipulative transactions but by agreeing to submit artificially low sales projections, *see id.*—just as defendants here agreed to submit artificially low borrowing-cost projections. The Fifth Circuit readily concluded that these coordinated lies "subverted" the otherwise lawful governmental process in a way that placed responsibility for the output restriction on the defendants and left them liable to the plaintiffs for violating the Sherman Act. *Id.* at 1295-96.

Accordingly, it is no defense to price fixing to argue—as the district court concluded (SPA31, 34, 41)—that the means of accomplishing the anticompetitive effect involved "misrepresentation" or "fraud" within the context of a benchmark-setting process. Price fixing accomplished through fraud is still price fixing. What matters under *Socony* is whether the *effect* of an agreement among competitors is to fix prices, not the means they choose to do so. *See* 310 U.S. at 223; *supra* pp.2,

29-30, 51-52.  Here, the effect of the conspiracy was to collusively manipulate prices by collectively submitting falsely low LIBOR quotes.  The fact that defendants' price-fixing conspiracy *also* involved misrepresentations makes it wrongful for a second reason, but that does not defeat the first.

> 4.      *Further competition over "spreads" is irrelevant.*

The district court also reasoned that fixing LIBOR ultimately lacked any anticompetitive effect because the banks remained free to compete in the ultimate rates offered on their instruments by adding or subtracting basis points from LIBOR—"the baseline from which market actors competed to set the price of LIBOR-based instruments."  SPA39.  The court identified no precedent for this proposition because none exists; the settled rule is exactly the opposite.  As a matter of law, the continuation of some level of competition with respect to spreads above or below LIBOR is "of no consequence."  *Socony*, 310 U.S. at 220; *Plymouth Dealers*, 279 F.2d at 132.  As Judge Posner has explained, "[a]n agreement to fix list prices is … a per se violation of the Sherman Act even if most or for that matter all transactions occur at lower prices."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002); *see also In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 362-63 (3d Cir. 2004) (same).

In fact, this exact argument was advanced and rejected in *Catalano*.  There, defendant beer wholesalers agreed to simultaneously abandon the practice of

extending limited-term, interest-free credit to retailers. 446 U.S. at 644-45. The Supreme Court recognized that this could perhaps lead to increased competition in the actual invoice prices, eliminating some or all of the anticompetitive effect. *See id.* at 649. But the Court found this irrelevant—credit terms were an "inseparable part of the price"—no less than LIBOR is an inseparable part of the price in transactions governed by LIBOR-based instruments—and agreements relating to such price elements "fall[] squarely within the traditional *per se* rule against price fixing." *Id.* at 648. In so holding, the Supreme Court relied on three trade-association price-fixing cases—*Sugar Institute v. United States*, 297 U.S. 553 (1936), *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978) and *FTC v. Cement Institute*, 333 U.S. 683 (1948)—to show that agreements that even *threaten* to cause a price-fixing effect are conclusively presumed to be illegal, even when they do so in a much more remote way than the kind of price-component manipulation at issue in *Catalano*, and here.

Moreover, the ultimate impact of defendants' conspiracy on prices in LIBOR-based financial instrument transactions will be a vigorously disputed factual issue in all of these cases that cannot be assumed in defendants' favor on their own motion to dismiss. *See, e.g.*, *Anderson News* 680 F.3d at 185. Thus, even if antitrust law did not *conclusively* presume that price fixing harms competition—even when some amount of competition survives, *see Catalano*, 446

U.S. at 648—basic procedural law would still prohibit the district court from reaching the *exact opposite* conclusion on the pleadings in favor of the parties moving to dismiss.

> 5.    *The district court's "hypothetical" test for antitrust injury is flawed and inconsistent with the per se rule.*

Finally, the district court went far astray in relying on *Brunswick* and *ARCO* to create a novel test for antitrust injury, under which a plaintiff's claim fails if "the harm alleged … could have resulted from normal competitive conduct."  SPA36. Applying that test, the district court found no antitrust injury because "the injury plaintiffs suffered from defendants' alleged conspiracy to suppress LIBOR is the same as the injury they would have suffered had each defendant decided independently to misrepresent its borrowing costs to the BBA."  *Id.*  There are two fundamental problems with this test.

First, as Judge Schofield held in *FOREX*, the district court's approach "does not even implicate the concept of antitrust injury" and "has nothing to do with whether Plaintiffs allege that they suffered an injury of the kind the antitrust laws were intended to prevent," 2015 WL 363894, at *11.  That is because it looks with indifference on whether the claim alleges an *agreement* to achieve a particular result.  The core idea of Sherman Act Section 1 is that "conduct can be legal when undertaken individually" but "illegal if undertaken collusively—that is the essence of a conspiracy."  *Id.*  Put otherwise, in cases where buyers or sellers allege harm

from horizontal price fixing, they are invoking the fundamental rule that the express or tacit *agreement* to set a certain price is unlawful under Section 1, whether truly independent actors could have arrived at that price or not. *See In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 915 n.19 (6th Cir. 2003) (noting that "in many instances, an otherwise legal action—*e.g.* setting a price—becomes illegal if it is pursuant to an agreement with a competitor," and rejecting "defendants' view" that "such an action would never cause antitrust injury because a defendant *could* have unilaterally and legally set the same price"). This Court has thus expressly rejected such counterfactual hypotheticals as tests of antitrust injury. *See Irvin Indus., Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 245-46 (2d Cir. 1992) ("The possibility that [defendant] might have submitted a lawful bid, and, if so, the same damage might have resulted, cannot in and of itself negate causation as a matter of law.").

Second, even if the district court's test had anything to do with antitrust injury, it either eviscerates the *per se* rule or else is easily met on the facts alleged in this case. One version of the test is that a plaintiff does not suffer antitrust injury if it is *theoretically* possible for the cartel members to have arrived at the collusive price without collusion. But that result is theoretically possible in every single cartel case. Prices can increase, even over extended periods of time, through conscious parallelism (that is, by following each other without express or tacit

agreement)—indeed, this is a recognized problem of concentrated markets. But there is no precedent for the proposition that this is either a defense to *actual* price-fixing agreements, or to a claim of damages predicated on the difference between the cartel price and the competitive price. This is, accordingly, another aspect of the district court's decision that seriously undermines Sherman Act Section 1.

Any other version of the test would be easily met here. As even the district court recognized, the reason cartel prices do not persist is that they are eventually competed down, and so the relevant question is whether defendants could have sustained *persistent* misreporting of below-market prices to the BBA without collusion. And that is a factual question on which—especially at the motion to dismiss stage—the answer is clearly no.

As explained above, *supra* pp.10-13, there was no way for defendants to maintain suppression of LIBOR without collusion. Submission of non-market based figures on an individualized basis would have resulted in obvious outliers, and the market would rapidly have smelled a rat. This would have had the exact opposite of the intended effect: It would have demonstrated fundamental uncertainty and weakness at a time when the banks hoped to demonstrate strength, and undermined their ability to obtain more favorable pricing through manipulating LIBOR as a credible measure of the market price for borrowing. Moreover, even if it were necessary to decide whether collusion was required to

maintain suppression of LIBOR (it isn't) and even if that fact were open to any reasonable dispute (it isn't), it cannot be assumed in *defendants'* favor at this stage. *Anderson News*, 680 F.3d at 185.[12]

## II. To The Extent Any Amendment Of The Complaints Was Necessary, The District Court Erred In Denying Leave To Amend

Defendants have agreed that all of the complaints now before the Court are functionally identical for the purposes of this appeal. *See supra* p.6 n.1. Accordingly, no amendment of any complaints should be necessary if this Court reverses on the first issue presented. To the extent that the issue is not moot, however, the district court erred in denying amendment because (1) it applied an erroneous legal standard, and (2) the amendments were not futile.

Rule 15(a)(2) instructs courts to "freely give leave [to amend] when justice so requires." This "mandate is to be heeded," because pleading is not "a game of skill"—instead, its purpose "is to facilitate a proper decision on the merits." *Foman v. Davis*, 371 U.S. 178, 181-82 (1962); *see also, e.g.*, *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-14 (2d Cir. 2011) (discussing *Foman*); *Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) (curative amendment should be permitted "at least once … as a matter of course"). Courts have discretion to deny

---

[12] The district court's assumption is also anomalous, given its own conclusion that it was "plausible that each defendant furthered other defendants' manipulation by submitting a quote that was roughly in line with ('clustered with') other quotes, thus decreasing the chance of detection." SPA121.

amendment for a substantial reason, but otherwise denial is "inconsistent with the spirit of the Federal Rules." *Foman*, 371 U.S. at 182.

Here, the district court refused to entertain *pre*-dismissal motions for leave to amend because, *inter alia*, "the possibility of leave to replead would put the case in the same position as if we granted plaintiffs' request now." JA417 (6:12-20). But, *post*-dismissal, the court took the opposite position: "Plaintiffs '[are] not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies.'" SPA202 (citation omitted). The court summarily denied leave, opining that "justice does not require" amendment, SPA198; SPA202, because permitting court-identified pleading deficiencies to be cured, as contemplated by the Supreme Court (in *Foman*) and this Court (in *Williams* and *Oliver Schools*), "is an unacceptable way to operate a system of justice," since it might have "the perverse effect of turning defense counsel and the Court into plaintiffs' counsel's co-counsel," SPA203.

This was twofold error. First, the district court's approach was manifestly unfair: It denied pre-dismissal leave because post-dismissal amendment would be sufficient, and denied post-dismissal leave on the ground that amendments should have been sought before the district court identified the purported pleading deficiencies. And second, the court's holding represents a direct rejection of controlling precedents: *Williams*, in particular, makes absolutely clear that a

plaintiff need not seek pre-dismissal amendment "without yet knowing whether the court will grant the motion, or, if so, on what ground." 659 F.3d at 214.

Notably, neither defendants nor the district court suggested that amendment would work any prejudice to the defendants. *See State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) ("Mere delay, … absent a showing of bad faith or undue prejudice, [is insufficient reason] to deny the right to amend."). Here, there was not even any delay: Plaintiffs sought amendment both *before* and *immediately after* the dismissal. And while the court noted the efforts expended on motion practice, SPA202, the costs of a single Rule 12(b)(6) motion cannot override the policy favoring curative amendment to facilitate merits-based adjudication without rendering the rule in *Foman* and *Williams* a dead letter.

To be sure, the district court also denied amendment as futile, SPA204-06, but that holding merely demonstrates the breadth of the district court's dismissal: In essence, the court concluded that fixing LIBOR *cannot* harm competition *under any set* of allegations.[13] As demonstrated above, that conclusion cannot be

---

[13]  Notwithstanding their allegations of *per se* anticompetitive, horizontal price fixing, plaintiffs proposed amendments that would clarify how defendants harmed competition, including more detailed allegations concerning defendants' horizontal competition, *e.g.*, Proposed Amended Bondholders' Complaint, JA585-86 ¶¶30-32; LIBOR's purpose and importance, *id.* JA588-90 ¶¶37-40; LIBOR's use as an explicit price term in plaintiffs' financial instruments, *id.* JA578, 656-58 ¶¶1, 184-90; and the impossibility of LIBOR suppression absent collusion, *id.* JA649-51 ¶¶153-62; *see generally* JA577-979 (all proposed amended complaints).

affirmed; it is contrary to every precedent regarding claims of antitrust injury by the victims of horizontal price fixing, and it poses a threat to antitrust enforcement as a whole. Reversing that reasoning will likely moot the need for any amendment of any complaint, but if not, it will surely mean that further allegations of competitive harm would be far from futile.

## CONCLUSION

The judgments below should be reversed and the cases remanded for further proceedings.

Dated: New York, New York
      May 20, 2015

/s/ Thomas C. Goldstein
Thomas C. Goldstein
Eric Citron
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
Telephone: (202) 362-0636
tg@goldsteinrussell.com
ecitron@goldsteinrussell.com

/s/*Karen L. Morris*
Karen L. Morris
Patrick F. Morris
MORRIS AND MORRIS LLC
    COUNSELORS AT LAW
4001 Kennett Pike, Suite 300
Wilmington, DE 19807
Telephone: (302) 426-0400
KMorris@morrisandmorrislaw.com
PMorris@morrisandmorrislaw.com
RMLindsey@morrisandmorrislaw.com

/s/*David H. Weinstein*

David H. Weinstein
Robert S. Kitchenoff
WEINSTEIN KITCHENOFF & ASHER LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone: (215) 545-7200
Weinstein@wka-law.com
Kitchenoff@wka-law.com

*Counsel for Plaintiffs-Appellants*
*Ellen Gelboim and Linda Zacher*
Case No. 13-3565


/s/*David Kovel*

David Kovel
KIRBY McINERNEY LLP
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
dkovel@kmllp.com


/s/*Christopher Lovell*

Christopher Lovell
LOVELL STEWART HALEBIAN
    JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
clovell@lshllp.com


*Interim Co-Lead Counsel for Exchange-Based*
*Plaintiffs-Appellants and the Class*
Case No. 15-454

/s/*William C. Carmody*

William Christopher Carmody
Arun Subramanian
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, l5th Floor
New York, New York 10022
Telephone : (212) 336-8330
 bcarmody@susmangodfrey.com
 asubramanian@susmangodfrey.com

Marc Seltzer
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Telephone:  (310) 789-3100
mseltzer@susmangodfrey.com

Michael D. Hausfeld
William P. Butterfield
Hilary K. Scherrer
Nathaniel C. Giddings
HAUSFELD LLP
1700 St. NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
mhausfeld@hausfeldllp.com
wbutterfield@hausfeldllp.com
hscherrer@hausfeldllp.com
ngiddings@hausfeldllp.com

*Counsel for Plaintiffs-Appellants Baltimore,*
*New Brítain, and TCEH and Interim Lead*
*Counsel for the Proposed OTC Plaíntíff Class*
Case No. 15-498

/s/ *Steven E. Fineman*

Steven E. Fineman
Michael J. Miarmi
LIEFF, CABRASER, HEIMANN &
    BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone: (212) 355-9500
sfineman@lchb.com
mmiarmi@lchb.com

Brendan P. Glackin
LIEFF, CABRASER, HEIMANN &
    BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
bglackin@lchb.com

*Counsel for Plaintiffs-Appellants The Charles Schwab Corporation; Charles Schwab Bank, N.A.; Charles Schwab & Co., Inc.; Schwab Money Market Fund; Schwab Value Advantage Money Fund; Schwab Retirement Advantage Money Fund; Schwab Investor Money Fund; Schwab Cash Reserves; Schwab Advisor Cash Reserves; Schwab YieldPlus Fund; Schwab YieldPlus Fund Liquidation Trust; Schwab Short-Term Bond Market Fund; Schwab Total Bond Market Fund; and Schwab U.S. Dollar Liquid Assets Fund* Case No. 15-432 *and for Bay Area Toll Authority* Case No. 15-778

/s/ *Nanci E. Nishimura*

Nanci E. Nishimura
Matthew K. Edling
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
nnishimura@cpmlegal.com
medling@cpmlegal.com

Alexander E. Barnett
COTCHETT, PITRE & McCARTHY, LLP
40 Worth Street
10th Floor
New York, NY 10013
Telephone: (212) 201-6820
abarnett@cpmlegal.com

*Counsel for Plaintiffs-Appellants The Regents of the University of California, East Bay Municipal Utility District, San Diego Association of Governments, City of Richmond, The Richmond Joint Powers Financing Authority, Successor Agency to the Richmond Community Redevelopment Agency, City of Riverside, The Riverside Public Financing Authority, County of Mendocino, County of Sacramento, County of San Diego, County of San Mateo, The San Mateo County Joint Powers Financing Authority, County of Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the County of Sonoma.*
Case No. 15-733

/s/ Richard W. Mithoff_____

Richard W. Mithoff
Warner V. Hocker
MITHOFF LAW FIRM
One Allen Center
Penthouse, Suite 3450
Houston, TX 77002
Telephone: (713) 654-1122
rmithoff@mithofflaw.com
whocker@mithofflaw.com

*/s/ Nanci E. Nishimura*_____

Nanci E. Nishimura
Matthew K. Edling
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
nnishimura@cpmlegal.com

Alexander E. Barnett
COTCHETT, PITRE & McCARTHY, LLP
40 Worth Street
10th Floor
New York, NY 10013
Telephone: (212) 201-6820
abarnett@cpmlegal.com

*Counsel for Plaintiff-Appellant City of Houston*
Case No. 15-744

/s/ *Steig D. Olson*

Steig D. Olson
Daniel L. Brockett
Daniel P. Cunningham
Jacob J. Waldman
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
danbrockett@quinnemanuel.com
danielcunningham@quinnemanuel.com
steigolson@quinnemanuel.com
jacobwaldman@quinnemanuel.com

*Counsel for Plaintiffs-Appellants*
*The City of Philadelphia and The Pennsylvania*
*Intergovernmental Cooperation Authority*
Case No. 15-547

/s/ *Daniel L. Brockett*

Daniel L. Brockett
Daniel P. Cunningham
Steig D. Olson
Jacob J. Waldman
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
danbrockett@quinnemanuel.com
danielcunningham@quinnemanuel.com
steigolson@quinnemanuel.com
jacobwaldman@quinnemanuel.com

*Counsel for Plaintiffs-Appellants Darby Finan-*
*cial Products and Capital Ventures Interna-*
*tional*
Case No. 15-551

/s/ *Daniel L. Brockett*

Daniel L. Brockett
Daniel P. Cunningham
Steig D. Olson
Jacob J. Waldman
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
danbrockett@quinnemanuel.com
danielcunningham@quinnemanuel.com
steigolson@quinnemanuel.com
jacobwaldman@quinnemanuel.com

*Counsel for Plaintiff-Appellant*
*Salix Capital US Inc.*
Case Nos 15-611, 15-620

/s/ *Daniel L. Brockett*

Daniel L. Brockett
Daniel P. Cunningham
Steig D. Olson
Jacob J. Waldman
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
danbrockett@quinnemanuel.com
danielcunningham@quinnemanuel.com
steigolson@quinnemanuel.com
jacobwaldman@quinnemanuel.com

*Counsel for Plaintiffs-Appellants Prudential In-*
*vestment Portfolios 2 on behalf of Prudential*
*Core Short-Term Bond Fund and Prudential*
*Core Taxable Money Market Fund*
Case No. 15-627

/s/ *David C. Frederick*
David C. Frederick
Wan J. Kim
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
dfrederick@khhte.com
wkim@khhte.com
grapawy@khhte.com
ashen@khhte.com

*Counsel for Plaintiff-Appellant*
*National Credit Union Administration Board*
Case No. 15-537

/s/ *Michael J. Guzman*
Michael J. Guzman
Andrew C. Shen
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
mguzman@khhte.com
ashen@khhte.com

/s/ Stuart H. McCluer
Stuart H. McCluer
McCulley McCluer PLLC
1223 Jackson Avenue East, Suite 200
Oxford, MS 38655
(662) 550-4511
smccluer@mcculleymccluer.com
*Counsel for Plaintiff-Appellant Guaranty Bank*
*& Trust Company*
Case No. 15-524

70

/s/ *Jeffrey A. Shooman*

Jeffrey A. Shooman
LITE DEPALMA GREENBERG, LLC
Two Gateway Center, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
jshooman@litedepalma.com

*Counsel for Plaintiff-Appellant*
*33-35 Green Pond Associates, LLC*
Case No. 15-441

/s/ *Scott P. Schlesinger*

Scott P. Schlesinger
Jeffrey L. Haberman
Jonathan R. Gdanski
SCHLESINGER LAW OFFICES, P.A.
1212 SE 3rd Avenue
Ft. Lauderdale, FL 33316
Telephone: (954) 320-9507
scott@schlesingerlaw.com
jhaberman@schlesingerlaw.com
jonathan@schlesingerlaw.com

*Counsel for Plaintiffs-Appellants*
*Amabile, et al.*
Case No. 15-825

/s/ *Jason A. Zweig*

Jason A. Zweig
HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Ste. 1700
New York, NY 10017-2416
Telephone: (212) 752-5455
jasonz@hbsslaw.com

*Counsel for Plaintiffs-Appellants*
*Courtyard At Amwell, LLC, Greenwich Com-*
*mons II, LLC, Jill Court Associates II, LLC,*

71

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certify that:

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because exclusive of the exempted portions it contains 13,998 words as counted by the word-processing program used to prepare the brief; and

2.     The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2007 in a proportionately spaced typeface: Times New Roman, font size 14.

Dated: May 20, 2015                    /s/ Thomas C. Goldstein
                                       Thomas C. Goldstein